Thomas JOHNSON, et al. Plaintiffs,

v.

Jeb BUSH, et al., Defendants.

No. 00–3542–CIV.

United States District Court,
S.D. Florida,
Miami Division.

July 18, 2002.

Nancy Northup, Brennan Center for Justice at N.Y.U. School of Law, New York City, James K. Green, James K. Green, P.A., West Palm Beach, Anita Hodgkiss, Lawyers' Committee for Civil Rights under Law, Washington, DC, for Plaintiffs.

Hamish Hume, Cooper & Kirk, PLLC, Washington, DC, Ronald A. Labasky, Skelding, Labasky & Cox, Tallahassee, Michael D. Cirrullo, Jr., Josias, Goren, Cherof, et al., Fort Lauderale, Betsy M. Steg, Office of the Pinellas County Attorney, Clearwater, Jeffrey P. Ehrlich, Assistant Miami–Dade County Attorney, Miami, Paul Hancock, Office of the Attorney General, Tallahassee, David Wagner, Alachua County Litigation Attorney, Gainesville, FL, H. Ray Allen, III, Hillsborough County Attorney, Tampa, FL, Robert C. Buschel, Ferrero, Buschel, Carter, et al., Ft. Lauderdale, FL, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

JAMES LAWRENCE KING, District Judge.

THIS CAUSE is before the Court on Defendants' Motion for Summary Judgment filed January 4, 2002. Plaintiffs filed a Corrected Response and Cross–Motion for Summary Judgment on January 25,

2002. Defendants filed a Corrected Reply on January 29, 2002. Plaintiffs filed a Reply on February 1, 2002. The Court heard argument on the cross-motions on May 24, 2002.

## I. BACKGROUND

### A. *Lead Plaintiffs and Plaintiff Class*

Plaintiff Thomas Jefferson is a 51–year–old African American male living in Gainesville, Florida with his wife and five children. He is the executive director of a non-profit Christian organization that runs a residential program for recently released offenders. Prior to moving to Gainesville in 1996, this Plaintiff lived in New York City where, after his release from a New York felony conviction in 1992, he worked for a homeless mission and a New York City transit agency. He has not had his civil rights restored and, thus, is ineligible to register and vote under Florida law. Mr. Johnson's life background is similar to the other seven lead Plaintiffs, five of whom are African American, one is a Hispanic and one is Caucasian. All have been convicted of felonies; all have successfully completed their terms of incarceration or probation; and all have not had restoration of their civil rights to register and vote.

Plaintiffs, on behalf of all Florida citizens convicted of felonies who have completed their sentences but nonetheless remain ineligible to vote, challenge Florida's disenfranchisement law. They allege that the disenfranchisement law arbitrarily and irrationally denies them the right to vote because of race, discriminate against them on account of race, and impose an improper poll tax and wealth qualification on voting in violation of the First, Fourteenth, Fifteenth, and Twenty–Fourth Amendments to the United States Constitution and §§ 2 and 10 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973 *et seq.*, and 42 U.S.C. § 1983.

### B. *Florida's Disenfranchisement Law*

Florida's disenfranchisement of criminals can be traced back to its first constitution. The 1838 Constitution provided that: "The General Assembly shall have the power to exclude from ... suffrage, all persons convicted of bribery, perjury, or other infamous crime .... Laws shall be made by the General Assembly to exclude from ... suffrage, those ... convicted of bribery, perjury, forgery, or other high crime, or misdemeanor ...." Fla. Const. art. VI, §§ 4, 13 (1838). This disenfranchisement provision remained unchanged by Florida's 1861 Constitution, Fla. Const. art. VI, §§ 2, 9 (1861), and essentially unchanged by Florida's 1865 Constitution,[1] Fla. Const. art. VI, §§ 2, 9 (1865).

Florida's constitutional convention of 1868 made many changes to the suffrage and eligibility provisions from previous constitutions, including recognizing right of suffrage for African Americans. The disenfranchisement provision was amended to state: "nor shall any person convicted of a felony be qualified to vote at any election unless restored to civil rights.... The Legislature shall have power and shall enact the necessary laws to exclude from ... suffrage, all persons convicted of bribery, perjury, larceny, or of infamous crime ...." Fla. Const. art. XIV, §§ 2, 4 (1868). The disenfranchisement provision remained essentially unchanged by the 1885 Constitution, except for reference to persons convicted "by a court of record." Fla. Const. art. VI, §§ 4–5 (1885).

The current version of Florida disenfranchise law was adopted by the Florida legislature in 1968. Florida's 1968 Consti-

---

**1.** Florida's Constitution of 1865 removed the comma after the words "high crime".

tution includes a felon disenfranchisement provision that states: "No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability." Fla. Const. art. VI, § 4.

### C. *Restoration of Rights and Removal of Disability*

Individuals disenfranchised by the felon disenfranchised provision of the 1968 Constitution may seek restoration of their civil rights, including the right of vote, by application to the state Clemency Board. The Clemency Board consists of the Governor and the members of the Cabinet. Fla. R. Exec. Clem. 1. Under Florida's Rule of Executive Clemency, an individual convicted of a felony may have his or her civil rights, excluding the right to own, possess, or use firearms, automatically restored without a hearing after completing and satisfying all sentences and all conditions of supervision if certain additional requirements have been met. These additional requirements include: no conviction for a capital or life felony; no restoration of the individual's civil rights nor granting of the individual a pardon within the past 10 years by the Clemency Board; and no declaration that the individual is (1) a habitual felony offender, (2) a habitual violent offender, (3) a three-time violent offender, (4) a violent career criminal or (5) a prison release re-offender.

At the time Plaintiffs filed their Complaint, applicants for restoration of civil rights were additionally prohibited from "hav[ing] any outstanding detainers, or any pecuniary penalties or liabilities, which total more than $1,000 and result from any criminal conviction or traffic infraction." Pre–6/01 Fla. R. Exec. Clem. 5(II). Though that condition has been removed and the Clemency Board no longer re-

quires applicants to have paid fines totaling over $1,000, the Clemency Board does continue to require applicants. to pay all victim restitution prior to being eligible for restoration of civil rights. *See* Fla. R. Exec. Clem. 9(A)(2). Thus, disenfranchised felons are ineligible to receive restoration of their civil rights without having paid off any pecuniary liabilities or having paid the full amount of restitution to victims even though the sentence of imprisonment and supervision has been completed by rule of the Clemency Board.

The Clemency Board has the authority to investigate, review, and hold hearings with respect to all clemency applications, and has the final authority on whether to grant an application for restoration of civil rights. If an individual wishes to apply for clemency even though he or she does not satisfy the eligibility requirements, including payment of victim restitution, he or she may apply for a waiver of these requirements.

### II. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted). The Court must view the evidence in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. If the movant meets this burden, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exits. *See Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir.1993).

If the evidence relied on is such that a reasonable jury could return a verdict in favor of the nonmoving party, then the Court should refuse to grant summary judgment. *See id.* at 919. A mere scintilla of evidence in support of the nonmoving party's position, however, is insufficient to defeat a motion for summary judgment. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. If the evidence is merely colorable or is not significantly probative, summary judgment is proper. *See id.* at 249–50, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Plaintiffs' Equal Protection and Due Process Claim of the Fourteenth Amendment

Plaintiffs' most basic assertion is that Florida's disenfranchisement law violates the substantive due process and equal protection under the 14th Amendment. They contend that permanent disenfranchisement of felons has no justifiable purpose, but instead is arbitrary and irrational. However, Plaintiffs' arguments fails in the face of clear precedent established by this Court and the Supreme Court of the United States. *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); *Beacham v. Braterman,* 300 F.Supp. 182 (S.D.Fla.1969).

In *Beacham v. Braterman,* a three judge district court held that the felon disenfranchisement provision at issue does not violate the Equal Protection nor the Due Process Clause of the Constitution of the United States. 300 F.Supp. 182. The *Beacham* court considered a class action challenging Florida's constitutional and statutory provisions disenfranchising convicted felons and the discretionary exercise of pardon power by the executive branch of the state government. It concluded that a state may constitutionally exclude from the franchise persons otherwise qualified to vote who have been convicted of a felony. *See id.* at 184 ("[T]he propriety of excluding felons from a franchise has been so frequently recognized—indeed put forward by the Justices to illustrate what the states may properly do—that such expressions cannot be dismissed as unconsidered dicta."). The *Beacham* court specifically declared that it is not a denial of equal protection of law or due process of law for the state to restore discretionarily the right to vote to some felons and not to others.

■ The Supreme Court summarily affirmed that decision, 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969). *Beacham,* therefore, is binding precedent upon this Court. *See, e.g., Hicks v. Miranda,* 422 U.S. 332, 344–45, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) ("[L]ower courts are bound by summary decisions by this Court ...."); 18 James Wm. Moore, et al., Moore's Federal Practice, § 1304[5] (3d ed. 1999) ("The Supreme Court treats its own summary affirmance of an appeal from a three-judge district court as precedent to be followed."). Accordingly, Plaintiffs' Equal Protection and Due Process arguments are foreclosed by *Beacham.* In addition, the Supreme Court of the United States has also weighed in on this issue. In *Richardson v. Ramirez,* the Court held that a State may, consistent with the Constitution of the United States, prohibit felons from voting under the Fourteenth Amendment. It explained that a blanket disenfranchisement provision does not violate the Equal Protection Clause of the Fourteenth Amendment because such a provision expressly finds "an affirmative sanction in § 2 of the Fourteenth Amendment." 418 U.S. at 53–4, 94 S.Ct. 2655. The *Richardson* Court held that subsequent jurisprudence interpreting the Equal Protection Clause has not altered the "settled historical and judicial under-

standing" that felon disenfranchisement provisions do not violate the United States Constitution. *Id.* at 54, 94 S.Ct. 2655. Thus, Plaintiffs' arguments fly in the face of clear Supreme Court precedent which held that felon disenfranchisement laws cannot be in violation of Fourteenth Amendment to the Constitution, either under the Equal Protection or Due Process Clause.

Plaintiffs' efforts to distinguish the Court's holding in *Ramirez* and call for this Court to overrule *Ramirez* are unpersuasive. Plaintiffs argue that Ramirez does not stand for the proposition that every possible felon disenfranchisement law is constitutional. They cite *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) and the Court's decision in *Ramirez* to remand the case to the California Supreme Court to determine whether the respondents have a valid claim that the county election officials' enforcement of the valid felon disenfranchisement violates the equal protection clause to support their contention that there all felony disenfranchisement laws are constitutional. However, this Court is bound by the Supreme Court's decision in *Ramirez* which holds that ex-felons exclusion from not voting does not violate the Equal Protection Clause of the Constitution. 418 U.S. at 56, 94 S.Ct. 2655. Thus, the Court grants summary judgement to the State on Plaintiffs Equal Protection claim under the Fourteenth Amendment.

**B. Plaintiffs' Claim that Felon Disenfranchisement Violates the First Amendment**

■ Plaintiffs also contend that the felon disenfranchisement provision violates the First Amendment as well. However, it is clear that the First Amendment does not guarantee felons the right to vote. *See Howard,* No. 99–2285, 2000 WL 203984, at

*2 ("The First Amendment creates no private right of action for seeking reinstatement of previously cancelled voting rights."); *see also, Farrakhan v. Locke,* 987 F.Supp. 1304 (E.D.Wash.1997) (holding that to hold the same Constitution that specifically recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment but also prohibits disenfranchisement under another amendment would be to interpret the Constitution in an inconsistent manner). This Court agrees with the holding of *Howard* and concludes that Plaintiffs do not have a cause of action under the First Amendment.

**C. Plaintiffs' Claim of Intentional Race Discrimination**

■ Plaintiffs also claim that Florida's felon disenfranchisement law violates the Equal Protection Clause of the Fourteenth Amendment by intentionally discriminating against them because of their race. To succeed on this claim, Plaintiffs must establish that the Florida felon disenfranchisement provision was framed and ratified with a discriminatory purpose. *See e.g., Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) ("basic equal protection principle [is] that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose.") "Discriminatory purpose" implies more than intent as volition or intent as awareness of consequences; it implies that the decision maker selected a particular course of action at least in part "because of," not merely, "in spite of," its adverse effects upon an identifiable group. *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (footnote and citation omitted). To this end, Plaintiffs have presented to this Court an abundance of expert testimony about the historical background of Flori-

da's felon disenfranchisement scheme as historical evidence that the policy was enacted originally in 1868 with the particular discriminatory purpose of keeping blacks from voting.

] As a matter of law, however, the re-enactment of the felon disenfranchisement provision in 1968 cleansed Florida's felon disenfranchisement scheme of any invidious discriminatory purpose that may have prompted its inception in Florida's 1868 Constitution. The Fifth Circuit holding in *Cotton v. Fordice*, 157 F.3d 388 (5th Cir.1998) is persuasive. In *Cotton*, the Fifth Circuit dismissed a constitutional challenge to the felon disenfranchisement provision of Mississippi's Constitution. The *Cotton* plaintiff argued that the provision was unconstitutional because it was originally drafted with the intent to disenfranchise blacks and was motivated by the desire to discriminate against blacks on account of race. While this Court has been vocal in its condemnation of any law created with the invidious purpose to discriminate against minorities, it agrees with the Fifth Circuit that "a facially neutral provision ... might overcome its odious origin." *Id.* at 391. Further, a new provision may supersede the previous provision and remove the discriminatory taint associated with the original version.

 Plaintiffs, nonetheless, urge this Court to look at the intent of those enacting the felon disenfranchisement provision of the 1868 Constitution. They argue that an Equal Protection analysis should not allow a discriminatory law to evade scrutiny merely because it is re-enacted by a later legislative body with mere cosmetic changes and without any comment or legislative consideration. According to Plaintiffs, the felon disenfranchisement provision have not been adequately deliberated since 1868 and all revisions to it have been stylistic rather than substantive. To an

extent, Plaintiffs are correct. A subsequent re-enactment of a discriminatory law can only be cleansed if the re-enacted law emerges from a deliberative process. *See id.* However, the Court finds that the record surrounding the re-enactment of Florida's felony disenfranchisement provision in 1968 clearly indicates that significant deliberations and substantive changes were made by the Florida legislature to the felon disenfranchisement provision in 1968.

It is undisputed that in 1965, Florida's Legislature created a Constitutional Revision Committee (the "CRC") to consider and devise recommendations for revisions to Florida's Constitution. The 1968 revision process was designed to completely overhaul the state constitution. App. 3 (Scher Rep. 3). The CRC, in turn, formed a Subcommittee on Suffrage and Elections which had authority for over the felon disenfranchisement provision. The Subcommittee met twelve times before proposing a revised felon disenfranchisement provision. *See* App. To Defs' Mot. Dismiss 795, 803 (Scher Dep. 11–2; 42–3). Both houses of the Florida legislature approved the revised Constitution as proposed by the CRC and placed the document on the 1968 ballot. The Constitution proposed by the CRC was then approved by Florida's electorate in November of 1968, fourteen months after adoption by the legislature. Thus, the record suggests that the adoption of felon disenfranchisement provision only came about after significant deliberation.

There is a public record of the Subcommittee considering the provision on February 2 and 3, 1966 that support the conclusion of significant deliberation of this provision by the Constitutional Revision Committee of 1965. The relevant minutes of the meetings state:

Mr. Earle moved that Article VI, Section 4 be adopted by the Committee on Suffrage and Elections. The motion was seconded.

Mr. Pettigrew moved to amend Mr. Earle's motion by striking "judicially determined to be of unsound mind, or under judicial guardianship because of mental disability" and to substitute therefor "persons adjudicated mentally incompetent." This motion was seconded and passed.

Mr. Pettigrew moved to further amend Section 4 by adding to his previous amendment: "in this or any other state and who have not had their competency judicially restored." This amendment was seconded and also passed.

After considerable discussion, Mr. Pettigrew moved that Section 4 be deleted and the following inserted: "The Legislature may by law establish disqualifications for voting for mental incompetency or conviction of a felony." The motion was seconded.

Mr. Goodrich offered the following substitute motion to Mr. Pettigrew's motion: Delete Section 4 and insert: "The Legislature may by law exclude persons from voting because of mental incompetence or commitment to a jail or penal institution." After discussion, Mr. Goorich's [sic] motion failed for lack of a second.

The vote was taken on Mr. Pettigrew's motion, but it failed adoption.

Mr. Goodrich moved that the word "felony" in line 2 of Section 4 be changed to "crime." The motion failed for lack of a second.

The Committee adopted Section 4 of Article VI with no further amendments. (Suffrage and Elections Committee Meeting, February 2 and 3, 1966, pp. 6–7.)

The felon disenfranchisement provision that was passed by the Subcommittee after significant consideration, accepted by the legislature after deliberations between legislators, and ultimately adopted by Florida's voters without any evidence of discussion of discriminatory intent based upon race.

The provision of 1968 did more than reflect mere "cosmetic" changes but contained substantially revisions to the 1885 law. The framers and ratifiers of the 1968 Constitution deliberately chose to change the prohibition on voting by felons in order to achieve a different and new result in terms of the persons who would be disqualified. The 1968 Constitution altered Article VI, Section 4, of the 1885 Constitution to categorically disqualify felons not only from voting but also from holding office. Additionally, it changed Article VI, Section 5, of the 1885 Constitution by deleting specific crimes that would have triggered disqualification included some misdemeanors. See, e.g., State ex rel. Jordan v. Buckman, 18 Fla. 267 (1881) (holding misdemeanor conviction for petty larceny triggered disenfranchisement). Thus, the legislature in 1986 disqualified a different category of person than its predecessors.

Plaintiffs at most have presented evidence to suggest that Florida's felon disenfranchisement policies were racially motivated in 1868. However, they have not presented any evidence that the legislature that enacted the felon disenfranchisement provision in 1968 did so to discriminate against African Americans. Without any evidence that Florida's disenfranchisement law enacted in 1968 was motivated by racial animus and with evidence that Florida's legislature significantly deliberated and substantively revised to the Florida's 1868 disenfranchisement law, the Court grants summary judgement in favor of the

State on Plaintiffs' claim of intentional racial discrimination.

## D. Plaintiffs' Claim of Violation of Section 2 of the Voting Rights Act

■ Plaintiffs claim that Florida's felon disenfranchisement provision violates Section 2 of the Voting Rights Act of 1982, 42 U.S.C. § 1973 by denying African Americans suffrage based on their race and color. Section 2 prohibits the State from enforcing any "qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Under this "results" standard, Plaintiffs do not need to prove that the felon disenfranchisement provision was adopted with a racially discriminatory purpose, *see Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), but that under the totality of the circumstances, the political process are not equally open to participation by members of a protected class in that its members have less opportunity than other members of the electorate to participate in the political process. *See Burton v. City of Belle Glade,* 178 F.3d 1175, 1198 (11th Cir.1999)(quoting 42 U.S.C. § 1973(b)).

The Court finds *Wesley v. Collins,* 605 F.Supp. 802 (M.D.Tenn.1985) to be instructive. In *Wesley,* the *pro se* plaintiff brought suit in federal court under the Voting Rights Act challenging a Tennessee law that deprived him of his right to vote while he served a plea-bargained suspended sentence. The *Wesley* court dismissed the plaintiff's claim on the grounds that the *pro se* plaintiff had failed to show a causal connection between the indicia of historically-rooted discrimination and the statute disenfranchising felons. *See id.* at 812. Therefore, to establish a Voting Rights Act violation, there must be a nexus between the discriminatory exclusion of blacks from the political process and the disenfranchisement of felons.

Furthermore, the Eleventh Circuit indicated that the existence of some form of racial discrimination remains the cornerstone of section 2 claims. *See Nipper v. Smith,* 39 F.3d 1494, 1515 (11th Cir.1994) (*en banc*) (Tjoflat, C.J., plurality opinion). Judge Tjoflat recognized that the deprivation of a minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause. *See Solomon v. Liberty County Comm'rs,* 221 F.3d 1218, 1225 (11th Cir.2000) (*en banc*) (quoting *Nipper,* 39 F.3d at 1515). Thus, no Section 2 violation occurs when factors other than race caused election results with a disparate impact on minorities. *See Southern Christian Leadership Conference v. Sessions,* 56 F.3d 1281, 1293 (11th Cir.1995) (*en banc*).

■ Here, it appears that African American ex-felons in Florida have less opportunity than similarly situation nonminorities on account of a racially neutral cause. The African American ex-felon Plaintiffs have not been denied the right to vote because an immutable characteristic but because of their own criminal acts. This is also true of the non-African American class members. Thus, it is not racial discrimination that deprives felons, black or white, of their right to vote but their own decision to commit an act for which they assume the risks of detection and punishment. *See Wesley v. Collins,* 605 F.Supp. 802, 813 (M.D.Tenn.1985) aff'd 791 F.2d 1255 (6th Cir.1986).

Plaintiffs point to the statistics of Florida's criminal justice system as evidence that it is infected by racism. While this court decries any racism that exists with

Florida's criminal justice system, the case law indicates that this evidence of disproportionate impact is irrelevant to the voting rights challenge. In *Farrakhan v. Locke*, No. 96-76-RHW (E.D.Wash.2000), the court held that even compelling evidence of bias in the administration of the criminal justice system failed to establish a claim for vote denial because even if the disproportionate numbers of minorities disenfranchised were the product of discriminatory animus on the part of prosecutors and judicial officials, Washington's felon disenfranchisement scheme would not violate Section 2 because it is discrimination in the criminal justice system, not the disenfranchisement provision itself, that causes the vote denial. *See id.* at *6.("At most, this establishes a flaw with the criminal justice system, not with the disenfranchisement provision."). "The mere fact that many incarcerated felons happen to be black and Latino is insufficient grounds to implicate the Fifteenth Amendment or the Voting Rights Act." *Id.* In rejecting a similar claim, the Sixth Circuit stated that "it is well-settled ... that a showing of disproportionate racial impact alone does not establish a per se violation of the Voting Rights Act." *Wesley*, 791 F.2d at 1260–61.

The Court thus finds that Plaintiffs have failed to make the requisite showing that they are denied the right to vote on account of race rather than some racially neutral cause. *See Solomon*, 221 F.3d at 1225. Plaintiffs have, in effect, disenfranchised themselves by committing a felony. *See Wesley*, 605 F.Supp. at 813 ("The law presumes that all men know its sanctions. Accordingly, the performance of a felonious act carries with it the perpetrator's decision to risk disenfranchisement."). Therefore, the State is entitled to summary judgement in their favor on Plaintiffs' Section 2 claim.

### E. Plaintiffs' Poll Tax and Wealth Qualification Claims

Plaintiffs' final claims allege that the requirement of the Clemency Board for applicants to pay all victim restitution, to be eligible for restoration of civil rights, constitutes an impermissible poll tax. At the time this case was filed, the State's rules predicated clemency on payment of criminal fines in excess of $1,000, and on payment of all victim restitution. In June, 2001, the Clemency Rules were modified to eliminate the prerequisite that fines in excess of $1,000 be paid prior to restoration of civil rights but retained the requirement that victim restitution be paid before clemency can be granted and voting rights restored.

Plaintiffs argue that the Fourteenth and Twenty–Fourth Amendments to the United States Constitution and section 10 of the Voting Rights Act, 42 U.S.C. § 1973h, do not permit the State to use ex-felon's financial status to deny them the right to vote, regardless of the other requirements that the state may require before granting restoration of civil rights. They assert that the imposition of financial conditions on regaining the right to vote constitutes a practical equivalent of a poll tax.

■■■ Plaintiffs correctly argue that access to the franchise cannot be made to depend upon an individual's financial resources. The Supreme Court has struck down numerous voting qualifications that conditioned voting or other political participation on payment of special fees, *see Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (candidate filing fee); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) ($1.50 poll tax); *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965) (certificate of residence or poll tax), or holding of prop-

erty, *see Hill v. Stone*, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975)(property available for taxation); *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969)(striking property ownership requirement for utility bond election). These qualifications constituted unconstitutional poll taxes by placing barriers on persons qualified to vote and their actual exercise of their right to vote.

 An unconstitutional poll tax, like those in the cases cited by the Plaintiffs, pertain to a tax (or the functional equivalent in the case of property ownership) directly burdens the exercise of an individual's proper exercise of their right to vote. As previously stated in this order, the State has permissibly stripped Plaintiffs of their right to vote along with other civil rights pursuant to their felony convictions. The State is not constitutionally obligated to return this right to them on completion of their sentence.[2] The victim restitution requirement, then, does not unduly burden the exercise of their right to vote given that that right has already been stripped from them. The victim restitution requirement is not a special fee that they must pay in order to exercise a right already existing in them, but a requirement made within the authority of the State to begin the process of having their civil rights fully restored. *See Howard v. Gilmore*, No. 99–2285, 2000 WL 203984, at *2 (4th Cir. Feb 23, 2000)(affirming the dismissal of a claim that Virginia's practice of requiring felons to pay a $10 fee to the Circuit Court of Richmond in order to begin the process of having his civil rights restored did not constitute an unconstitutional poll tax in violation of the Twenty–Fourth Amendment). It is not Plaintiffs'

right to vote which payment of a victim restitution is being conditioned but rather it is the restoration of his civil rights which is being conditioned. *See id.*

Moreover, the State of Florida has created an administrative mechanism through which disenfranchised felons who are unable to satisfy the prerequisites for restoration of their civil rights, including restoration of their right to vote, may obtain a waiver of this prerequisite. An applicant for restoration of civil rights can request a waiver of this condition. *See* Fla. R. Exec. Clem. 8. Thus, Plaintiffs' right to vote is not necessarily "denied or abridged ... by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV.

The Court finds that victim restitution is a crucial part of the debt the convicted felon owes to both the victim and society. Payment of that debt is directly related to the question of the applicant's rehabilitation and readiness to return to the electorate. The Clemency Board's requirement that applicants pay all victim restitution furthers rehabilitation and readiness for return to the electorate. Plaintiffs must complete their sentences, including payment of restitution, or seek a waiver, before being restored to the electorate. Accordingly, the State is entitled to summary judgement in their favor on Plaintiffs' poll tax claims.

## IV. CONCLUSION

After a careful review of the record and the Court being otherwise fully advised, it is

ORDERED, ADJUDGED and DECREED that Defendants' Motion for Summary Judgment be, and the same is here-

---

2. In fact, the court notes that at least 12 states offer ex-felons no opportunity or avenue by which they can have their voting rights re-

stored to them. *McGrath v. United States*, 60 F.3d 1005, 1008 (2d Cir.1995).

by, GRANTED. The above-styled case is DISMISSED with prejudice.