[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-14469

_____

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**DECEMBER 19, 2003**
**THOMAS  K. KAHN**
**CLERK**

D. C. Docket No. 00-03542-CV-JLK

THOMAS JOHNSON,
DERRICK ANDRE THOMAS, et al.,
in their own right and as
representatives of all ex-felon citizens
of Florida,

Plaintiffs-Appellants,

OMALI YESHITELA,

Plaintiff,

versus

GOVERNOR OF THE STATE OF FLORIDA,
Jeb Bush,
SECRETARY OF THE STATE OF FLORIDA,
Katherine Harris, et al.,
in their roles as members of the
Clemency Board of Florida,
BEVERLY HILL,
Alachua County Election Supervisor, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(December 19, 2003)**

Before BARKETT and KRAVITCH, Circuit Judges, and FULLAM[*], District Judge.

BARKETT, Circuit Judge:

On September 21, 2000, eight Florida citizens[1] ("the Plaintiffs") filed this class action lawsuit on behalf of all Florida citizens who have been convicted of a felony and successfully completed all terms of incarceration, probation, or parole, but who are still ineligible to vote under Florida's felon disenfranchisement law.[2] The Florida Constitution provides that "[n]o person convicted of a felony . . . shall be qualified to vote or hold office until restoration of civil rights or removal of disability." Fla. Const. art. VI, § 4 (1968). The Plaintiffs sued members of

---

[*]Honorable John P. Fullam, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1]Thomas Johnson, Derrick Andre Thomas, Eric Robinson, Omali Yeshitela, Adam Hernandez, Kathryn Williams-Carpenter, Jau'dohn Hicks, and John Hanes. On January 17, 2001, the district court dismissed Yeshitela as a plaintiff because his civil rights had been restored.

[2]Thus, this case does not involve those persons who are still incarcerated, who are on probation or parole, or who have not completed every requirement or condition of such probation or parole.

2

Florida's Clemency Board in their official capacity[3] ("the Defendants"), alleging that this law violates the First, Fourteenth, Fifteenth, and Twenty-Fourth Amendments to the United States Constitution and Sections 2 and 10 of the Voting Rights Act of 1965, codified as amended at 42 U.S.C. § 1973 et seq. After excluding certain expert testimony, the district court granted summary judgment to the Defendants on all claims, and the Plaintiffs now appeal. We affirm the district court's grant of summary judgment on the Plaintiffs' poll tax claim, but, because there are disputed issues of fact to be resolved, we reverse and remand for further proceedings on the equal protection and voting rights claims.

## I. STANDARD OF REVIEW

We review a grant of summary judgment de novo, applying the same legal standards as the district court. Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224-25 (11th Cir. 2002). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating the argument of the moving party, the district court must view all evidence in the light

---

[3]The Governor of Florida and the Cabinet collectively constitute the Clemency Board, which has the power to restore civil rights, including the right to vote. See Fla. R. Exec. Clemency. The suit also named Florida's county supervisors of elections. Their participation has been abated pending determination of liability.

most favorable to the non-moving party and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). If the record presents factual issues, or if reasonable minds might disagree about the inferences arising from the facts, then the court should deny summary judgment. Id. On a motion for summary judgment, the district court may not weigh evidence or find facts. Morrison v. Amway Corp., 323 F.3d 920, 924 (11th Cir. 2003). We review rulings to exclude expert testimony for abuse of discretion. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002).

## II. EQUAL PROTECTION CLAIM

Observing that Florida is one of only seven states that permanently disenfranchise first-time convicted felons unless they receive clemency, the Plaintiffs allege in their first claim on appeal that (1) the Florida Constitution's provision mandating felon disenfranchisement was adopted in 1868 with the intent to discriminate against African-American voters, (2) the intent of the 1868 framers remains operative despite the provision's reenactment in 1968, and (3) the provision had and continues to have the discriminatory effect intended. As such, the Plaintiffs contend that the provision violates the Equal Protection Clause,

4

which prohibits any State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

To decide whether a facially neutral law invidiously discriminates on the basis of race in violation of equal protection, an important factor to consider is whether its impact bears more heavily on one race than another. See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977); Washington v. Davis, 426 U.S. 229, 242 (1976). In this case, the Plaintiffs have presented evidence that Florida's disenfranchisement of felons has a disproportionate impact on African Americans.[4] According to that evidence, Florida currently disenfranchises over 613,000 men and women on account of a prior felony conviction. Doc. 121 at 490. When Florida enacted its most recent constitution in 1968, voting-age African Americans were more than twice as likely as non-African Americans to be barred from the vote on account of a prior felony conviction. See Doc. 163 at Addendum. The disparity is even more pronounced today. Approximately 10.5% of voting-age African Americans in Florida – over 167,000 men and women – are now disenfranchised as ex-felons, compared with

---

[4]Because on summary judgment we must view all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in its favor, Burton, 178 F.3d at 1187, this opinion recounts facts as presented by the Plaintiffs unless otherwise noted. Some facts are contested, and we take no position as to which, if any, of these facts may ultimately be proved at trial.

5

4.4% of the non-African-American population. Doc. 121 at 509. More than one in six adult African-American males in Florida are disenfranchised due to a prior felony conviction. Doc. 121 at 509. Moreover, using arrest rates as a proxy for criminal involvement, the Plaintiffs have offered evidence that between 25 and 36 percent of the racial disproportionality in felony convictions – and therefore disenfranchisement due to felony convictions – cannot be explained by differential involvement in crime by race. Doc. 120 at 20-23. Thus, the Plaintiffs have presented sufficient evidence of racially disproportionate impact both in 1968 and today to support their position on this issue at summary judgment.

However, although relevant, disproportionate impact alone is not sufficient to prove invidious racial discrimination in violation of the Fourteenth Amendment. Davis, 426 U.S. at 242. To prove that a facially neutral law with racially disproportionate effects violates the Equal Protection Clause, the Plaintiffs must show that racially discriminatory intent was a substantial or motivating factor behind its adoption, although it need not be the only factor. See Arlington Heights, 429 U.S. at 264-65 ("[Washington v. Davis] does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad

6

mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one.").

The evidentiary inquiry into discriminatory motive is rarely simple: "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Id. at 266. Although a general history of past discrimination "cannot, in the manner of original sin, condemn governmental action that is not itself unlawful," City of Mobile v. Bolden, 446 U.S. 55, 74 (1980), the particular law's historical background is a source of probative evidence of intent. See Arlington Heights, 429 U.S. at 266-67. "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." Id. at 267. Moreover, proof of discriminatory intent behind a specific policy in the past creates an inference that the impermissible purpose continues into the present, despite the passage of time and even, in some instances, intervening changes to the policy. See Hunter v. Underwood, 471 U.S. 222, 233 (1985) (observing that the original enactment of the Alabama Constitution's criminal disenfranchisement provision was motivated by a desire to discriminate

against blacks, continues to have that effect, and therefore violates equal protection, despite intervening events that narrowed the scope of the provision).[5]

With these principles in mind, we turn to the origins of Florida's current felon disenfranchisement provision. It is true that Florida's earliest constitution, ratified in 1838, empowered the legislature to disenfranchise certain criminal offenders.[6] However, the fact that the 1838 Florida Constitution granted this

[5]See also United States v. Fordice, 505 U.S. 717, 747 (1992) (Thomas, J., concurring) (observing that "discriminatory intent does tend to persist through time"); McMillan v. Escambia County, 638 F.2d 1239, 1249 (5th Cir. 1981) ("If the system was unconstitutional in its inception and if it continues to have the effect it was designed to have, then the pure hearts of current council members are immaterial."); Kirksey v. Bd. of Supervisors, 554 F.2d 139, 148 (5th Cir. 1977) (en banc) ("[N]othing in [Washington v. Davis or Arlington Heights] suggests that, where purposeful and intentional discrimination already exists, it can be constitutionally perpetuated into the future by neutral official action."); Brown v. Bd. of Sch. Comm'rs of Mobile County, 542 F. Supp. 1078, 1090 (S.D. Ala. 1982) (looking to the intent behind an 1876 statute, rather than its 1919 reenactment, in the absence of evidence that the latter had changed the relevant features of the election plan), aff'd. 706 F.2d 1103 (11th Cir. 1983) (explicitly affirming the district court on all issues), aff'd. 464 U.S. 105 (1983); Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 266, 270 n.22 (1979) (implying, in an equal protection claim, that the purpose of the current Massachusetts veterans preference law may be located in its 1896 origins despite a number of amendments, including eliminations and extensions); Irby v. Virginia State Bd. of Elections, 889 F.2d 1352, 1356 (4th Cir. 1989) (suggesting that the 1971 retention, with no debate, of a particular provision of the Virginia Constitution did not cleanse it of its original discriminatory intent).

[6]The 1838 Constitution included two references to criminal disenfranchisement. Article VI, § 4 read:

> The General Assembly shall have power to exclude from every office of honor, trust or profit, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, or other infamous crime.

Fla. Const. art VI, § 4 (1838). Article VI, § 13 read:

> Laws shall be made by the General Assembly, to exclude from office, and from suffrage, those who shall have been or may thereafter be convicted of bribery, perjury, forgery, or other high crime, or misdemeanor; and the privilege of suffrage shall be supported by laws regulating elections, and prohibiting, under adequate penalties, all undue influence thereon, from power, bribery, tumult, or other improper practices.

8

power at a time when African Americans could not vote does not foreclose the Plaintiffs' claim of invidious discrimination in violation of the Equal Protection Clause. A law may be infected by discriminatory intent at any stage, including a later reenactment. See McMillan v. Escambia County, 638 F.2d 1239, 1246 n.14 (5th Cir. 1981).[7] Indeed, the district court found in this case that

> Plaintiffs have presented to this Court an abundance of expert testimony about the historical background of Florida's felon disenfranchisement scheme as historical evidence that the policy was enacted originally in 1868 with the particular discriminatory purpose of keeping blacks from voting.

Johnson v. Bush, 214 F. Supp. 2d 1333, 1338-39 (S.D. Fla. 2002) (emphasis added).

According to the Plaintiffs' evidence, which consists primarily of the expert report and testimony of one of Florida's leading historians of Reconstruction, Dr. Jerome Shofner,[8] Florida refused to extend civil and political rights to blacks immediately following the Civil War. For example, the State denied blacks the right to vote in its 1865 constitution, rejected the Fourteenth Amendment in 1866,

Fla. Const. art. VI, § 13 (1838).

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[8]Dr. Shofner, who spent more than thirty years studying and teaching about Florida history and the Reconstruction era, has written ten books on those subjects and, additionally, has published two scholarly pieces focusing on Florida's 1868 constitutional convention. Doc. 122 at 906-07; Doc. 121 at 457.

9

and established additional crimes, including a new, expansive type of larceny, in order to "address the altered condition of the colored race." Doc. 121 at 430-32.

In response, as a condition of readmission to the Union, Congress required Florida to extend voting rights regardless of race, pursuant to which Florida convened its 1868 constitutional convention. Id. at 433-34. Initially dominated by Radical Republicans supporting black enfranchisement, this convention first approved a constitution (1) lacking any provision disenfranchising voters on the basis of criminal convictions, (2) restricting ex-Confederate white suffrage, and (3) providing for equal population legislative districts. Id. at 439. Subsequently, however, a competing faction of Moderate Republicans, who sought the support of white ex-Confederate Floridians opposed to black suffrage, took control of the convention from the Radical Republicans. Id. at 439-40. Maintaining frequent contact with white ex-Confederate leaders, the reconstituted convention established a legislative apportionment scheme that diminished representation from densely populated black counties. It also proposed a new suffrage article automatically disenfranchising those persons convicted of infamous crimes while restoring suffrage to ex-Confederates. Id. at 440-41. Then, at the last moment, the delegates substituted yet another, arguably even more stringent suffrage article that (1) changed that disenfranchisement provision's scope from infamous crimes to all

10

felonies; (2) inserted a provision, which had existed in the 1838 Constitution but had been eliminated by the Radical Republicans, granting the legislature power to disenfranchise persons convicted of bribery, perjury, and other infamous crimes; and (3) included in that enumerated list the crime of larceny, which the 1865 legislature had expanded to address the emancipation of blacks.  Id. at 432, 441-42.

In the end, this alternative version of the constitution prevailed.[9]  Shortly afterward, one of the Moderate Republican leaders boasted that he had kept Florida from becoming "niggerized."[10]  Doc. 122 at 791, 869.  One of the 1868 convention delegates also reported in 1881 that the criminal disenfranchisement provisions

---

[9]The two provisions for criminal disenfranchisement enacted in 1868 read:
No person under guardianship non compos mentis, or insane, shall be qualified to vote at any election, nor shall any person convicted of felony be qualified to vote at any election unless restored to civil rights. . . .
Fla. Const. art. XIV, § 2 (1868).
The Legislature shall have power and shall enact the necessary laws to exclude from every office of honor, power, trust, or profit, civil or military, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, larceny, or of infamous crime. . . .
Fla. Const. art. XIV, §4 (1868).  In 1885, these provisions were renumbered as article VI, §§ 4 and 5, respectively, but the language remained largely unchanged except for the addition of "by a court of record" to the new § 4.

[10]There is no evidence in the record that this boast referred specifically to the 1868 Constitution's criminal disenfranchisement provisions.  But taking the evidence we do have in the light most favorable to the Plaintiffs, a reasonable fact-finder could conclude that in 1868, certain political factions did whatever they could to prevent African Americans from being able to vote, including inserting both the better-known discriminatory voter apportionment and appointment provisions as well as the lesser-known criminal disenfranchisement provisions into the constitution with the intent to achieve that goal.  It is at least as likely that the 1872 boast referred to the whole 1868 Constitution, including criminal disenfranchisement, as that it was limited only to the other, more obviously discriminatory provisions.

11

were being used to reduce the number of black voters, Doc. 121 at 444, an effect that the Plaintiffs argue continues to date. Based on the different versions of the constitution, the last minute amendments and vote changes, and the general historical context, Dr. Shofner concluded that intentional racial discrimination had motivated the Florida Constitution's criminal disenfranchisement provisions as passed in 1868. See Doc. 121 at 426-28; Doc. 142 at 3-10.

Accepting the Plaintiffs' evidence, a reasonable fact-finder could conclude that the discriminatory animus behind the felon disenfranchisement provision's 1868 adoption satisfies the Plaintiffs' initial burden of showing that race was a substantial or motivating factor behind the constitutional provision here challenged. Arlington Heights, 429 U.S. at 266. Once the Plaintiffs have made this threshold showing, "the burden shifts to Appellees to prove that, at the time of the discriminatory act, the same decision would have been made for a legitimate reason." Burton, 178 F.3d at 1189 (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)) (emphasis added). The summary judgment record here does not, however, establish that the Defendants have shown as a matter of law that the constitutional convention would have passed the felon disenfranchisement provision in 1868 absent a racially impermissible purpose. Thus, were the 1868 Constitution Florida's most recent, our present inquiry could

12

end here.  The case would be controlled directly by the Supreme Court's unanimous opinion in <u>Hunter v. Underwood</u>, 471 U.S. 222 (1985), which found that the Alabama Constitution's criminal disenfranchisement provision, passed in 1901, was motivated by racially discriminatory intent, would not have been enacted at that time without the racially discriminatory intent, and therefore violated the Equal Protection Clause.

However, Florida ratified a new constitution in 1968.  Although the provision explicitly disenfranchising all felons remained substantively unchanged, the 1968 Constitutional Revision Committee did make certain textual modifications.  As amended in 1885, the felon disenfranchisement provision had read:

> No person under guardianship, <u>non compos mentis</u> or insane shall be qualified to vote at any election, nor shall any person convicted of felony by a court of record be qualified to vote at any election unless restored to civil rights.

Fla. Const. art. VI, § 2 (1885).  After the 1968 revision, the provision reads:

> No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.

13

Fla. Const. art. VI, § 4 (1968).[11]  The summary judgment record reflects no

evidence that racial considerations were discussed by the participants in the 1968

constitutional revision process when they passed the felon disenfranchisement

provision.  Thus, had the 1968 provision been Florida's first enactment of such a

felon disenfranchisement rule, our analysis would look first to the Supreme Court's

opinion in Richardson v. Ramirez, 418 U.S. 24 (1974), which held that felon

disenfranchisement laws are not per se unconstitutional.

This case, however, fits neither the Hunter nor the Richardson model.  The

1868 convention did not have the final word on the disenfranchisement provision.

Nor did the provision originate in 1968.  Thus, accepting as true that the

provision's purpose in 1868 included impermissible intentional racial

discrimination, we must consider the legal effect to be accorded the retention of

this provision in 1968.

The Plaintiffs argue that when discriminatory intent motivated a prior

enactment, the State bears the burden of showing that, to avoid perpetuating the

impermissible purpose, the later reenactment had a legitimate, non-discriminatory

---

[11]The 1968 Constitution also deleted the provision that had read:
The Legislature shall have power to, and shall, enact the necessary laws to exclude from every office of honor, power, trust or profit, civil or military, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, larceny, or of infamous crime. . . .
Fla. Const. art.VI, § 5 (1885).

14

basis. The Defendants counter that the State bears no burden and, moreover, that the original provision has no legal effect in light of a later reenactment.

Although neither this Court nor the Supreme Court has yet confronted this question in the context of felon disenfranchisement, courts have considered the legal effect of race-neutral policies that serve to perpetuate intentional racial discrimination in other contexts. For example, courts have considered equal protection challenges when asserted to invalidate laws, policies, and practices arising from a history of de jure segregation. In these cases, when original discriminatory intent has been demonstrated, the State has been required to show that the original taint has been purged and even, in some circumstances, that the State has taken affirmative steps to remove the effects of the discrimination.[12]

Specifically, in holding that States have an affirmative duty to dismantle the vestiges of past de jure segregation in higher education, the Supreme Court concluded that the State of Mississippi had not satisfied its constitutional burden

---

[12]See, e.g., Fordice, 505 U.S. at 728; Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 537-38 (1979) (noting the "affirmative duty [to desegregate] imposed by our cases" and stating that "[g]iven intentionally segregated schools in 1954, . . . the Board [of Education] was thereafter under a continuing duty to eradicate the effects of that system"); Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 458 (1979) (stating that once official segregation has been shown, "[u]nder the Fourteenth Amendment and the cases that have construed it, the Board [of Education]'s duty to dismantle its dual system cannot be gainsaid"); Green v. County Sch. Bd. of New Kent County, 391 U.S. 430, 437 (1968) (holding that a Virginia school board did not meet its affirmative burden to "take[] steps adequate to abolish" its past de jure racial segregation when it adopted a facially race-neutral policy of school choice, because it was ineffective in accomplishing actual desegregation).

15

through "the adoption and implementation of race-neutral policies alone," United States v. Fordice, 505 U.S. 717, 729 (1992), because such policies did not stem the effects of the past discrimination and less segregative alternatives existed. See id. at 743. Linking intent to the State's burden, Justice Thomas further observed in Fordice that,

> given an initially tainted policy, it is eminently reasonable to make the State bear the risk of nonpersuasion with respect to intent at some future time, both because the State has created the dispute through its own prior unlawful conduct, and because discriminatory intent does tend to persist through time. . . . Thus, if a policy remains in force, without adequate justification and despite tainted roots and segregative effect, it appears clear – clear enough to presume conclusively – that the State has failed to disprove discriminatory intent.

Id. at 747 (Thomas, J., concurring).

Applying the standards articulated in Fordice to hold that Alabama had also not met its constitutional obligation with respect to its prior de jure segregated university system, this Circuit made clear in Knight v. Alabama, 14 F.3d 1534 (11th Cir. 1994), that "[o]nce it is determined that a particular policy was originally adopted for discriminatory reasons, the Fordice test inquires whether the current policy is 'traceable' to the original tainted policy, or is 'rooted' or has its 'antecedents' in that original policy." Id. at 1550. When that is established, the burden of proof lies with the State to show that it has dismantled the past discrimination "root and branch." Id. at 1540, 1552 (quotation omitted); see also

16

Fordice, 505 U.S. at 731 ("If the State perpetuates policies and practices traceable to its prior system that continue to have segregative effects . . . the State has not satisfied its burden of proving that it has dismantled its prior system."). In Knight, drawing heavily on the "causation principles articulated in Fordice," we therefore framed our analysis of facially race-neutral policies enacted against an originally discriminatory backdrop in terms of "break[ing] the causal chain." Knight, 14 F.3d at 1550.

These cases required the State to dismantle a prior discriminatory education system by eradicating its effects. While their particular remedies might not be completely applicable here, we do derive guidance from their rationale, which demands that the State demonstrate a break in the causal chain of discrimination to assure compliance with the Equal Protection Clause. Surely if a State has an affirmative duty to dismantle the vestiges of past de jure segregation in the education context, it must bear some burden when the right to vote – a citizen's most basic right in a democracy – has been impermissibly abrogated.[13] At a

_____

[13]Cf. Reynolds v. Sims, 377 U.S. 533, 562 (1964) ("[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights."). The dissent insists that felon disenfranchisement and higher education should be subject to different standards of review because Mississippi had no valid educational justification for maintaining segregated schools. However, the Plaintiffs allege that Florida intended to categorize voters on the basis of race, not criminal activity. Just as there is no constitutionally legitimate reason to segregate schools on the basis of race, even if the facially neutral policies used to maintain such segregation – such as school choice programs or admissions standards – might also have non-racial justifications, there is no constitutionally legitimate reason to deny the right to vote to

17

minimum, as Justice Thomas noted, once the State has impermissibly discriminated on the basis of race through a particular law and continuing discriminatory effects have been established, then the State must disavow any connection to the law's original discriminatory purpose by showing that it was later reenacted for independent, non-discriminatory reasons.

The application of this principle in discrimination law appropriately draws on fundamental principles of causation and intent prevalent throughout the legal system. In both criminal law and the law of torts, for example, the legal effects of a wrongful action are held to reach through subsequent events to encompass remote but foreseeable harms. See, e.g., Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (N.Y. 1928); United States v. Hayes, 589 F.2d 811, 821 (5th Cir. 1979). As evidenced in Knight, this principle of legal causation is often conceptualized by reference to a metaphorical "chain of causation" that links events through time. See, e.g., United States v. Rodriguez, 279 F.3d 947, 952 (11th Cir. 2002). Though it generally stretches intact and inertially between events, the causal chain may be severed by a sufficiently independent intervening

---

felons or anyone else on the basis of race. Additionally, although felon disenfranchisement does not apply only to African Americans, racially discriminatory policies can be deliberately over-inclusive. Poll taxes, for example, surely disenfranchised some whites as well as blacks even though they were discriminatorily intended to impact blacks. It is impermissible to have an over-inclusive felon disenfranchisement law intended to keep blacks from voting, even if it keeps certain white convicted criminals away from the polls as well. See also infra note 23.

action.[14]  This concept of a "new intervening action," rooted in common sense, is frequently used by courts to analyze whether events that occur subsequent to an initial action operate to break the causal chain.  See, e.g., Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986) (recognizing the causal chain between an application for a warrant and an improvident arrest because "§ 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions");  United States v. Waksal, 709 F.2d 653, 663 (11th Cir. 1983) ("No significant intervening event purged the taint of the illegal restraint on appellant's liberty.");  United States v. Cantu, 230 F.3d 148, 158 (5th Cir. 2000) (King, J., concurring) (examining "whether there were any intervening circumstances sufficient to break the causal chain thus dissipating the taint of the initial illegality") (internal quotations omitted).

A new action or event is only considered to be sufficiently "intervening" if it is made freely, deliberately, and knowledgeably.  See, e.g., Hart & Honoré, Causation in the Law at 136.  Thus, the actions of uninformed agents who unwittingly further the principal's purposes are generally deemed inadequate to break the causal chain.  Cf. Rodriguez, 279 F.3d at 952 (noting that it is a "basic principle of criminal law that foreseeable negligent acts of a third party do not

---

[14]This concept is captured by the traditional doctrine of novus actus interveniens.  See, e.g., H.L.A. Hart & A.M. Honoré, Causation in the Law 73-74 (1985).

sever the chain of causation"); Rest. (2d) Torts § 452 (stating that a third person's failure to prevent harm is not a superceding cause of the harm). In contrast, the exercise of independent judgment by a later actor may suffice to sever the connection to the original wrongful action. See, e.g., Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999) ("It is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment."); Hand v. Gary, 838 F.2d 1420, 1427-28 (5th Cir. 1988) (stating that presenting all facts to an independent intermediary will break a chain of causation, while misdirecting the intermediary "by omission or commission perpetuates the taint of the original official behavior"). Applied in the context of an originally discriminatory legislative action, these principles direct us to consider whether a subsequent reenactment was made with sufficient knowledge and purpose to be deemed a new intervening event, thereby breaking the chain of invidious intent.

In Hunter, the Supreme Court looked to the original intent and found that certain intervening events were insufficient to break the causal chain of discrimination. In that case, the Court held that a criminal disenfranchisement law is unconstitutional if "its original enactment was motivated by a desire to discriminate against blacks on account of race and the [law] continues to this day

20

to have that effect." 471 U.S. at 233. In so holding, the Court rejected Alabama's

argument that its current interest in disenfranchising certain criminal offenders

legitimated its originally discriminatory disenfranchisement provision. Rather than

accept a non-discriminatory justification post-hoc, the Court focused on the State's

original intent, observing that "such a [legitimate] purpose simply was not a

motivating factor of the 1901 convention." Id. at 232.

> The Hunter Court further noted that:
>
> At oral argument in this Court, the appellants' counsel suggested that, regardless of the original purpose of § 182, events occurring in the succeeding 80 years had legitimated the provision. Some of the more blatantly discriminatory selections, such as assault and battery on the wife and miscegenation, have been struck down by the courts, and appellants contend that the remaining crimes--felonies and moral turpitude misdemeanors--are acceptable bases for denying the franchise. Without deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under Arlington Heights.

Id. at 233 (emphasis added). In Cotton v. Fordice, 157 F.3d 388, 391 (5th Cir.

1998), the Fifth Circuit relied upon this statement to conclude that Hunter "left open

the possibility that by amendment, a facially neutral provision . . . might overcome

its odious origin."[15] On that basis, the Fifth Circuit upheld, despite its

---

[15]With its language, the Hunter Court left equally open the converse possibility that prior discriminatory purpose could be perpetuated through an amendment enacted pursuant to a non-discriminatory legislative process.

discriminatory origin, a criminal disenfranchisement provision subsequently reenacted with modifications by the State of Mississippi.  While we agree that Hunter left open the possibility that reenactment may be sufficient in some circumstances to "break the causal chain," Knight, 14 F.3d at 1550, we disagree with the Fifth Circuit's failure to consider whether such reenactment must be accompanied by an independent, non-discriminatory purpose.

Based on all of the foregoing, we conclude that an original discriminatory purpose behind Florida's felon disenfranchisement provision establishes an equal protection violation that persists with the provision unless it is subsequently reenacted on the basis of an independent, non-discriminatory purpose.  Thus, if an impermissible discriminatory intent is found to be a motivating factor behind the 1868 enactment of the provision, and the Defendants do not show that it would have been enacted at that time absent the impermissible discriminatory intent, the Defendants have the burden to show that the State knowingly and deliberately reenacted it for a non-discriminatory reason.

At this stage of the proceedings, when viewed in the light most favorable to the Plaintiffs, the record before the district court does not show that the 1968 Constitution gave effect to an independent, non-discriminatory purpose in keeping

22

the felon disenfranchisement provision.[16]  Although the record reflects that the five-person Subcommittee on Suffrage and Elections "discussed" the provision at one of its twelve meetings, there is no evidence regarding the substance of that discussion nor that the Constitutional Revision Committee as a whole or the legislature ever discussed the provision.[17]  While it is possible to speculate from the minutes that

_____

[16]The dissent implies that Florida had a legitimate policy reason in 1968 for continuing to disenfranchise felons.  We find no evidence in the summary judgment record of such a legitimate motive in 1968.  Although a few courts have suggested non-racially discriminatory public policy rationales for disenfranchising felons, see Green v. Bd. of Elections, 380 F.2d 445, 451 (2d Cir. 1967); Washington v. State, 75 Ala. 582, 585 (1884), others have questioned those rationales. See, e.g., Richardson, 418 U.S. at 79-82 (Marshall, J., dissenting); Farrakhan v. Locke, 987 F. Supp. 1304, 1312 (E.D. Wash. 1997); Stephens v. Yeoman, 327 F. Supp. 1182, 1188 (D.N.J. 1970). See also Afi S. Johnson-Parris, Note: Felon Disenfranchisement: The Unconscionable Social Contract Breached, 89 Va. L. Rev. 109 (2003); Alec C. Ewald, "Civil Death": The Ideological Paradox of Criminal Disenfranchisement Law in the United States, 2002 Wisc. L. Rev. 1045 (2002); Note, The Disenfranchisement of Ex-Felons: Citizenship, Criminality, and "The Purity of the Ballot Box," 102 Harv. L. Rev. 1300 (1989) (all challenging the validity and/or constitutionality of the assumptions behind those rationales).  Moreover, the United States appears unique in the world community in the manner in which it permits felon and ex-felon disenfranchisement.  See Jamie Fellner & Marc Mauer, Losing the Right to Vote: The Impact of Felon Disenfranchisement Laws, The Sentencing Project & Human Rights Watch Report (Oct. 1998), http:// www.hrw.org/reports98/vote/usvot98o-04.htm#0112_273.  For example, Canada recently declared its prisoner disenfranchisement statute unconstitutional, regarding the law as a violation of a fundamental democratic right.  See Suavé v. Canada (Chief Electoral Officer), 2002 S.C.C.D.J. 2883, 2002 S.C.C.D.J. LEXIS 81 (Oct. 31, 2002).  In any case, the debate over the soundness of felon disenfranchisement or its rationales is irrelevant in the absence of any evidence that the framers of the 1968 Florida Constitution considered any such independent, non-discriminatory reasons for retaining felon disenfranchisement.  Cf. Hunter, 471 U.S. at 232 (rejecting Alabama's argument that it had a legitimate interest in its criminal disenfranchisement law because that interest was not shown to be a motivating factor in 1901).

[17]The relevant portion of the Subcommittee minutes reads as follows:

Mr. Earle moved that Article VI, Section 4 be adopted by the Committee on Suffrage and Elections.  The motion was seconded.
Mr. Pettigrew moved to amend Mr. Earle's motion by striking "judicially

Subcommittee members discussed non-discriminatory reasons for disenfranchising

felons, one could equally conclude that the Subcommittee regarded the felon

disenfranchisement provision as a legacy of previous constitutions that did not need

to be revisited in substance.[18] Retaining an originally discriminatory provision in

order to preserve continuity, or out of deference to tradition, or simply due to inertia

does not amount to an independent purpose sufficient to break the chain of

causation between the original racial animus and the provision's continuing force as

---

determined to be of unsound mind, or under judicial guardianship because of mental disability" and to substitute therefor "persons adjudicated mentally incompetent." This motion was seconded and passed.

Mr. Pettigrew moved to further amend Section 4 by adding to his previous amendment: "in this or any other state and who have not had their competency judicially restored." This amendment was seconded and also passed.

After considerable discussion, Mr. Pettigrew moved that Section 4 be deleted and the following inserted: "The Legislature may by law establish disqualifications for voting for mental incompetency or conviction of a felony." The motion was seconded.

Mr. Goodrich offered the following substitute motion to Mr. Pettigrew's motion: Delete Section 4 and insert: "The Legislature may by law exclude persons from voting because of mental incompetence or commitment to a jail or penal institution." After discussion, Mr. Goorich's [sic] motion failed for lack of a second.

The vote was taken on Mr. Pettigrew's motion, but it failed adoption.

Mr. Goodrich moved that the word "felony" in line 2 of Section 4 be changed to "crime." The motion failed for lack of a second.

The Committee adopted Section 4 of Article VI with no further amendments.

Minutes of the Suffrage and Elections Committee of the Florida Constitution Revision Commission, Feb. 2-3, 1966, at 6-7.

[18]Cf. Richardson, 418 U.S. at 44 ("The Journal of that Committee's proceedings shows only what motions were made and how the various members of the Committee voted on the motions; it does not indicate the nature or content of any of the discussion in the Committee. While the Journal thus enables us to trace the evolution of the draft language in the Committee, it throws only indirect light on the intention or purpose of those who drafted § 2.").

24

law. Thus, if the 1968 constitutional drafters kept a long-standing provision essentially intact for any of these reasons, then the discriminatory animus of which that provision was born, if ultimately proved as a matter of fact, would suffice to establish unconstitutional racial discrimination in violation of the Fourteenth Amendment.

Accordingly, because the Plaintiffs' showing of racial animus in the 1868 provision creates a genuine issue of material fact as to whether it was adopted with a discriminatory purpose, and because on this record the Defendants have not met their burden of showing that this provision was reenacted in 1968 with an independent, non-discriminatory purpose, summary judgment was improperly granted. We therefore reverse and remand to the district court for further proceedings on the equal protection claim.[19]

---

[19]On remand, the parties shall be given the opportunity to engage in additional discovery to address any other evidence pertaining to the motivations behind the passage of the felon disenfranchisement provision in 1868 and 1968. An assessment of the drafters' purposes would, among other things, look to the historical context in which the provision was considered, the discussions held at that time, and the changes effectuated. See Arlington Heights, 429 U.S. at 266-67. Eliminating only one part of an odious provision while maintaining other parts that continue to have racially discriminatory effects, for example, might perpetuate rather than eliminate the taint. Cf. Hunter, 471 U.S. at 233 (narrowing changes by the courts to Alabama's criminal disenfranchisement law did not cure the equal protection violation).

In addition, we find meritorious the Plaintiffs' claim that evidence from their expert Richard Scher should be considered as well. Although the district court originally granted the Defendants' motion in limine to exclude Scher's evidence because it would not be helpful to the trier of fact, both parties at summary judgment relied on Scher's expert report and testimony for almost all of their evidence as to the 1968 constitutional revision process. Moreover, the district court cited to Scher's evidence in the order granting summary judgment. See Johnson v. Bush, 214 F.Supp. 1333, 1339 (S.D. Fla. 2002). We also observe that Scher's proposed testimony

## III. VOTING RIGHTS CLAIM

Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as amended, prohibits the use of any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  42 U.S.C. § 1973(a).[20]  In 1982, Congress amended the Act to provide explicitly that a violation of Section 2

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

---

about the 1968 constitutional revision process, drawing upon his specialized knowledge of information located in archives in Tallahassee, sheds light on the sensitive factual inquiry into discriminatory intent, see Arlington Heights, 429 U.S. at 266, 268, an inquiry distinct from the practice, familiar to courts and lawyers, of using legislative history to discern the intent of the legislature as it bears on a law's meaning.

[20] The full text of subsection (a) states:
> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [42 U.S.C. § 1973b(f)(2)], as provided in subsection (b).

42 U.S.C. § 1973(a).

42 U.S.C. § 1973(b).

The 1982 amendments were passed in response to the Supreme Court's opinion in City of Mobile v. Bolden, 446 U.S. 55 (1980), which held that proof of intentional discrimination was necessary to establish violations of both the Fifteenth Amendment and Section 2 of the Voting Rights Act. The 1982 amendments instead established a "results" test "to make clear that proof of discriminatory intent is not required to establish a violation of Section 2." S. Rep. No. 97-417, at 2 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 179; see also United States v. Marengo County Comm'n, 731 F.2d 1546, 1557 (11th Cir. 1984) (describing the enactment of the 1982 amendments).

The new subsection (b) "provides that the issue to be decided under the results test is whether the political processes are equally open to minority voters." S. Rep. at 2. In explaining the amended standard, the 1982 Senate Judiciary Committee majority report lays out a broad, non-exclusive list of factors to consider ("the Senate factors"), which include any history of voting-related official discrimination, the extent to which minority group members bear the effects of discrimination in other areas which hinder their ability to participate effectively in the political process, and the extent to which the State has used voting practices that

27

tend to enhance the opportunity to discriminate against the minority group.[21] Id. at 28-29.

Guided by the relevant Senate factors, courts must then evaluate a Section 2 claim "based on the totality of circumstances." 42 U.S.C. § 1973(b). In other words, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Thornburg v. Gingles, 478 U.S. 30, 47 (1986).[22] Although

---

[21]The enumerated Senate factors also include the extent of racially polarized voting, the exclusion of minority group members from candidate slating processes, the use of racial appeals in political campaigns, the extent to which members of the minority group have been elected to public office in the jurisdiction, the tenuousness of the State's interest in the particular practice, and evidence that elected officials are unresponsive to the needs of minority group members. S. Rep. at 28-29.

[22]Although much of the legislative history of Section 2 and most of the cases focus on the abridgement of the right to vote by dilution of minority voting strength, see, e.g., S. Rep. at 29-31; H.R. Rep. No. 97-227, at 18, 30 (1981); Holder v. Hall, 512 U.S. 874 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986); Nipper v. Smith, 39 F.3d 1494 (11th Cir. 1994) (en banc); Solomon v. Liberty County, 899 F.2d 1012 (11th Cir. 1990) (en banc); see also Frank R. Parker, The "Results" Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard, 69 Va. L. Rev. 715, 762 (1983), the statute's "results test" – as determined by the totality of the circumstances – also applies by its plain language to claims of absolute denial of the vote. See 42 U.S.C. § 1973; see also S. Rep. at 30 ("Section 2 remains the major statutory prohibition of all voting rights discrimination."). We have not yet explicated the meaning of the results test in the context of a vote denial claim, but this Court has explicitly recognized the applicability of the totality of the circumstances inquiry and implicitly accepted the relevance of some of the evidence described by the "Senate factors." See Burton, 178 F.3d at 1197-98; see also Farrakhan v. Washington, 338 F.3d 1009, 1015 n.11 (9th Cir. 2003) ("Farrakhan III") ("We have held that the totality of the circumstances approach applies to both vote dilution and vote denial claims."); Mississippi State Chapter, Operation PUSH v. Allain, 674 F.Supp. 1245, 1263 (N.D. Miss. 1987) ("While the Committee report makes reference to dilution, the court is of the opinion that the same language and analysis is applicable to this voter registration case.").

different factors have varying relevance depending on the particular practice at issue, see S. Rep. at 28, it is clear that a proper examination cannot focus solely on one explanation for the vote denial or abridgement but must involve a "[s]earching practical evaluation of the past and present reality" of the challenged voting structure, Gingles, 478 U.S. at 45, and its interaction with social and historical conditions, id. at 47 n.8, including the "searching and meaningful evaluation of all the relevant evidence." Southern Christian Leadership Conference of Ala.v. Sessions, 56 F.3d 1281, 1293 (11th Cir. 1995) (en banc). Each situation is particular, and as a result, each inquiry is fact-intensive. See Gingles, 478 U.S. at 79 ("This determination is peculiarly dependent upon the facts of each case, and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms.") (internal citations omitted).

In this case, the Plaintiffs challenge the adverse summary judgment on their Section 2 vote denial claim, arguing that the district court erred by failing to consider the evidence they presented in accordance with the totality of the circumstances standard delineated above. We agree. In granting summary judgment, the district court simply concluded that "it is not racial discrimination that deprives felons, black or white, of their right to vote but their own decision to commit an act for which they assume the risks of detection and punishment."

29

Johnson, 214 F.Supp. 2d at 1341. This conclusion, however, only begs the question. The proper question here is whether felon status "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."[23] Gingles, 478 U.S. at 47. Indeed, in Hunter, the Supreme Court found that Alabama's criminal disenfranchisement law could not constitutionally be used as a tool for discrimination on the basis of race, even though the plaintiffs had been convicted of crimes.[24] Thus, the fact that the Plaintiffs have been convicted of crimes "was not a

---

[23]Similarly, in other cases, otherwise neutral categories or classifications have interacted with social and historical conditions so as to function as proxies for race. For example, a literacy test, by itself a constitutional race-neutral voting qualification, may violate the Voting Rights Act when it is used to deny African Americans the right to vote, see South Carolina v. Katzenbach, 383 U.S. 301, 333-34 (1966) (upholding the Voting Rights Act's ban on literacy tests although a facially fair literacy test is not per se unconstitutional). In addition, facially race-neutral poll taxes and grandfather clauses have been declared unconstitutional when used as proxies to deny African Americans the franchise. See Guinn v. United States, 238 U.S. 347, 364-67 (1915) (striking down exemption from literacy tests for any "person who was, on January 1, 1866, or any time prior thereto, entitled to vote . . . and [any] lineal descendant of such person" because "the standard itself inherently brings [a racially exclusionary] result into existence"); United States v. Alabama, 252 F. Supp. 95 (M.D. Ala. 1966) (three-judge district court) (finding Alabama's poll tax unconstitutional because its purpose and effect was to discriminate on the basis of race).

[24]In reaching its conclusion, the district court relied in part on the Sixth Circuit's opinion in Wesley v. Collins, 791 F.2d 1255 (6th Cir. 1986), aff'g 605 F.Supp. 802, 813 (M.D. Tenn. 1985). However, Wesley failed to adequately consider the Supreme Court's approach to racially discriminatory disenfranchisement, noting erroneously that "the disenfranchisement of felons has never been viewed as a device by which a state could discriminatorily exclude a given racial minority from the polls." Wesley, 791 F.2d at 1262 (affirming the trial court's conclusion that disenfranchising felons has never been linked to discriminatory attempts to prevent racial minorities from voting, despite Hunter's holding the previous year). See also Baker v. Pataki, 85 F.3d 919, 940 n.10 (2d Cir. 1996) (in banc) (Feinberg, J., concurring) (rejecting Wesley's conclusions).

bar to the plaintiffs claims in Hunter v. Underwood, and should play no different role in the case at hand." Farrakhan v. Locke, 987 F.Supp. 1304, 1313 (E.D. Wash. 1997) ("Farrakhan I"), aff'd by Farrakhan v. Washington, 338 F.3d 1009, 1016 (9th Cir. 2003) ("Farrakhan III") (agreeing that disenfranchised felons may state a claim of vote denial under Section 2 of the Voting Rights Act). We therefore find that the district court erred by relying at summary judgment solely on the fact of the Plaintiffs' criminal convictions rather than looking to the totality of the circumstances.

In addition, the district court relied on the Eastern District of Washington's opinion in Farrakhan v. Locke, No. 96-0076, 2000 U.S. Dist. LEXIS 22212 (E.D. Wash. 2000) ("Farrakhan II"), which granted summary judgment on the basis that discrimination in the criminal justice system was insufficient to establish that Washington's felon disenfranchisement law violated Section 2 of the Voting Rights Act. That case, however, was reversed, and the appellate court concluded that

> [t]o the extent that racial bias and discrimination in the criminal justice system contribute to the conviction of minorities . . . , such discrimination would clearly hinder the ability of racial minorities to participate effectively in the political process, as disenfranchisement is automatic. Thus, racial bias in the criminal justice system may very well interact with voter disqualifications to create the kind of barriers to political participation on account of race that are prohibited by Section 2, rendering it simply another relevant social and historical condition to be considered where appropriate.

Farrakhan III, 338 F.3d at 1020.  We agree with this analysis and conclude that the district court erred in disregarding the Plaintiffs' evidence of discrimination in the criminal justice system at the summary judgment stage.  The weight due to this evidence is a disputed question for the fact-finder at trial.[25]

Finally, we note that the Plaintiffs presented evidence bearing on a number of relevant Senate factors, including, inter alia, (1) a history of official discrimination by the State of Florida touching on the right to vote, including but not limited to the racially discriminatory origins of blanket felon disenfranchisement in the state; (2) the use of voting practices or procedures that enhance opportunities for discrimination against the minority group; and (3) the effects of discrimination in other areas that affect felon disenfranchisement, such as education, employment, and health.[26]  When taken in the light most favorable to the Plaintiffs, a fact-finder

---

[25]In this regard, we also find that Professor Richard Engstrom's expert testimony on racially polarized voting in Florida should not have been excluded on the grounds that it is not relevant to this type of vote denial claim.  Although the weight to be given it is left to the fact-finder, the evidence is relevant to the consideration of the totality of the circumstances, including the extent of racial bias in the community, and the interaction of those circumstances.  Moreover, as this case is being remanded for further consideration and discovery, the arguments pertaining to a delayed disclosure of the testimony of James Ginger and the five Florida Supreme Court Racial and Ethnic Bias Study Commission reports on which he relied are moot, as the State now has the opportunity to respond.

[26]For example, the record includes evidence of Florida's history of official discrimination in elections; the disproportionate impact of felon disenfranchisement on African Americans; racial bias in the criminal justice system, see Doc. 142 at 17-18 (describing the conclusion of the Florida Supreme Court's Racial and Ethnic Bias Study Commission that "differential treatment results, at least in part, from racial and ethnic bias on the part of enough individual police officers, prosecutors, and judges to make the system operate as if it intended to discriminate

could conclude that under the totality of the circumstances test, this evidence demonstrates intentional racial discrimination behind Florida's felon disenfranchisement as well as a nexus between disenfranchisement and racial bias in other areas, such as the criminal justice system, in violation of the Voting Rights Act.

For the foregoing reasons, summary judgment should not have been granted on the Plaintiffs' Section 2 vote denial claim.[27]

---

against non-whites"); the historical use of criminal justice in Florida as a tool to subjugate African Americans; and the impact of past racially discriminatory criminal justice policies on current disenfranchisement. The Plaintiffs also cite to evidence of the effects of discrimination in education, such as differences in graduation rates, higher education degrees, and per capita income; the impact of those effects on criminal arrest rates and on the restoration of rights after serving a sentence; and the tendency of the eligibility requirements for the restoration of rights to exclude more African Americans.

[27]The dissent argues that our interpretation of the scope of the Voting Rights Act creates serious constitutional problems because it allows the Voting Rights Act to "trump" the text of Section 2 of the Fourteenth Amendment, which expressly permits states to deny the right to vote "for participation in rebellion, or other crime." However, notwithstanding the text of Section 2, states clearly do not have the right to intentionally disenfranchise felons on the basis of race. See Hunter, 471 U.S. at 233 ("[W]e are confident that § 2 [of the Fourteenth Amendment] was not designed to permit the purposeful racial discrimination attending the enactment and operation of [Alabama's criminal disenfranchisement law] which otherwise violates § 1 of the Fourteenth Amendment. Nothing in our opinion in Richardson v. Ramirez, supra, suggests the contrary."). Thus, although Congress might not be able to ban all state criminal disenfranchisement laws, it may certainly exercise the power granted to it under Section 5 of the Fourteenth Amendment to enforce statutorily the constitutional prohibition against racially discriminatory criminal disenfranchisement. See Baker, 85 F.3d at 936-37 (Feinberg, J., concurring) (writing for one-half of the evenly-split in banc Second Circuit); cf. Marengo County Comm'n, 731 F.2d at 1550, 1563 (holding that Section 2 as amended in 1982 is a constitutional exercise of congressional enforcement power under the 14th and 15th Amendments).

Moreover, insofar as the dissent is assuming that Section 2 of the Fourteenth Amendment expressly authorizes Florida to disenfranchise convicted felons, even where its manner of doing so disproportionately impacts racial minorities, we question this interpretation, for which the

## IV. POLL TAX/WEALTH DISCRIMINATION CLAIMS

Access to the franchise cannot be made to depend on an individual's financial resources. Harper v. Va. State Bd. of Elections, 383 U.S. 663, 668 (1966). As the Second Circuit has stated, "[t]he focal question is whether [the State], once having agreed to permit ex-felons to regain their vote and having established administrative machinery for this purpose, can then deny access to this relief, solely because one is

---

dissent provides no authority. We think it better to interpret this constitutional provision to permit Florida and other states to disenfranchise convicted felons in a racially neutral manner–that is, in a manner that is neither racially motivated nor produces racially disproportionate effects. Viewed in this light, the Constitution's express permission to states to disenfranchise felons is compatible with the scope of the Voting Rights Act, and no constitutional problem arises by assuming that Congress may use its enforcement power to proscribe felon disenfranchisement policies that have racially discriminatory effects. Cf. Marengo County Comm'n, 731 F.2d at 1563 ("Section 2 [of the Voting Rights Act] does not conflict with or contract any right protected by the Constitution, and nothing in the Constitution either explicitly or implicitly prohibits a results standard for voting rights violations.").

Finally, we note that the legislative history and precedent discussed by the dissent pertain only to Section 4 of the Voting Rights Act, 42 U.S.C. § 1973b, which addresses "tests or devices" used to determine voter eligibility in certain states and political subdivisions, and not to Section 2. Our predecessor court observed that the Voting Rights Act of 1965 "contains a number of different provisions each with a different objective, that for its comprehension critical examination of each section is essential and that the reader cannot, therefore, assume that each of the sections is designed to reach the same objective or is necessarily to be read in the same manner." United States v. Uvalde Consol. Indep. Sch. Dist., 625 F.2d 547, 550 (5th Cir. 1980). See also Baker, 85 F.3d at 939 (Feinberg, J., concurring ) ("Because §§ 2 and 4 have different purposes, scope and language, the legislative history of § 4(c) is not necessarily applicable to interpretation of § 2."). Section 4's prohibition of specified "tests or devices" brings with it a host of additional requirements for states and political subdivisions covered by the section. In contrast, Section 2 applies nationally to prohibit a broader range of practices than those "tests or devices" defined in Section 4, but only when their use results in the denial or abridgement of the right to vote on account of race. It is perfectly conceivable that Congress might wish to exclude a particular practice from section 4's "test or device" label to avoid attaching to it the additional requirements, yet still intend to prohibit that practice when the evidence shows that its use results in the denial of the right to vote on account of race.

too poor to pay the required fee." Bynum v. Conn. Comm'n on Forfeited Rights, 410 F.2d 173, 175-76 (2d Cir. 1969) (sending challenge to Connecticut's $5 fee for filing an application for restoration of rights to a three-judge district court).

In this case, however, Florida's Rules of Executive Clemency do not deny access to the franchise to those too poor to pay restitution.[28] Under the Rules, restoration of civil rights, including the franchise, can still be granted to felons who cannot afford to pay restitution. We are not convinced that requiring a hearing under certain circumstances, including the failure to pay restitution, is sufficient to support the Plaintiffs' claim. Thus, because the current Rules of Executive Clemency do not deny access to the restoration of the franchise based on ability to pay, we affirm the district court's judgment that no violation of the constitutional and statutory prohibitions against poll taxes exists here.[29]

**V. CONCLUSION**

[28]The district court erroneously observed that "It is not Plaintiffs' right to vote which payment of a victim restitution is being conditioned but rather it is the restoration of his civil rights which is being conditioned." Johnson, 214 F. Supp. 2d at 1343. As one of the civil rights to be restored, clearly the right to vote depends on any conditions that apply to the restoration of civil rights in general.

[29]In doing so, we say nothing about whether conditioning an application for clemency on paying restitution would be an invalid poll tax.

We therefore **AFFIRM** the district court's order granting summary judgment to Defendants on the poll tax claim. We **REVERSE** and **REMAND** the equal protection and vote denial claims.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.

KRAVITCH, Circuit Judge, dissenting:

I disagree with the majority's analysis of both the Equal Protection and Voting Rights Act claims.  Therefore, respectfully I dissent.

## I.  The Equal Protection Claim

The text of the Fourteenth Amendment explicitly allows states to disenfranchise convicted felons, U.S. CONST. amend. XIV, § 2 , and the Supreme Court unambiguously has determined that a state's decision to permanently disenfranchise such citizens, in itself, is not an Equal Protection violation. Richardson v. Ramirez, 418 U.S. 24, 53-55, 94 S.Ct. 2655, 2670-71, 41 L.Ed.2d 551 (1974). Of course, a state may not *intentionally* use a facially-neutral measure to discriminate on the basis of race.  Washington v. Davis, 426 U.S. 229, 239-4, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976).   This prohibition includes enacting a felon disenfranchisement provision in order to deprive one racial group of its right to participate in the political process.  Hunter v. Underwood, 471 U.S. 222, 233, 105 S.Ct. 1916, 1923, 85 L.Ed.2d 222 (1985).  But the State of Florida's decision to bar felons from voting should not, in itself, cast suspicion on the motives of the state.  The dispositive question in this case is whether the plaintiffs have alleged such facts that, if true, would be sufficient to establish intentional discrimination in

37

Florida's *current* disenfranchisement statute. In my view, the plaintiffs do not do so, and thus I would affirm the district court.

## A. Background

The State of Florida's decision to disenfranchise felons has a long history, beginning before the Civil War. In its 1838 Constitution, Florida first denied voting rights to those convicted of crimes. After the Civil War, Florida was required to change its Constitution for readmittance to the Union and subsequently held two constitutional conventions–one in 1865 and the other in 1868. The 1865 Constitution was inadequate because it did not extend the franchise to African Americans. The 1868 Constitutional Convention cured this defect. Delegates to both conventions decided to disenfranchise felons, a decision explicitly left to their discretion by the Fourteenth Amendment. One hundred years later in 1968, the State of Florida comprehensively revised its Constitution and again decided to deny felons the right to vote. Any felon, however, who has completed his sentence, including any orders of restitution, may apply for clemency to have his civil rights restored.[1] Fla. Stat. § 940 (2003).

---

[1] There are conditions to the restoration of civil rights, including conviction of fewer than three violent crimes.

38

## B. The Constitutional Revision Process

There is no question that the felon disenfranchisement provision was based on a non-racial rationale when it was first included in the Florida Constitution in 1838. At that time, the right to vote was only extended to white males. The plaintiffs allege that the decision to retain the disenfranchisement provision in the 1868 Constitution was motivated by a desire to minimize black voting power. Because it is not the role of this court to make factual determinations, we view the evidence in the light most favorable to the plaintiffs.[2] We need not assume, however, that racial animus was the *sole* rationale. Indeed, as the plaintiffs' expert acknowledges, at least five African American delegates to the 1868 Convention, of the sixteen African American delegates voting, supported this provision, presumably not for racially-discriminatory reasons.

---

[2] Nonetheless, I question the majority's description of the record. In particular, the majority states that one white delegate to the 1868 Constitutional Convention stated several years later that he had helped prevent the state from being "niggarized." A white politician running for office in 1872 made this despicable comment in reference to the entire 1868 Constitution. Although this is evidence of an unfortunate and indefensible racial animus in nineteenth-century Florida politics, there is no evidence that the comment was in reference to the felon disenfranchisement provision. It is far more likely that the comment referenced other provisions in the 1868 Constitution, such as the voter apportionment system.

The plaintiffs' expert states voter apportionment and the appointment (rather than election) of many political posts were the most significant and well-known issues of 1868 Constitutional Convention, while felon disenfranchisement was a relatively minor issue. In fact, the plaintiff's expert acknowledged that the historical record is mixed on the felon disenfranchisement provision. The 1868 Constitution's felon suffrage provisions garnered the support of several of the Radical Republicans, including four African American delegates who consistently voted with the Radical Republicans. Doc. 122 at 875.

In 1968, Florida again reexamined and revised its Constitution and enacted the current felon disenfranchisement provision. The 1968 Constitution was passed after the state had engaged in four stages of deliberation, including debate and revision by the Suffrage and Elections Committee, review by the Florida Constitutional Revision Committee, approval from both houses of the legislature and finally affirmation by a state-wide referendum.

There is no allegation in the complaint that the 1968 Constitutional Convention was infected with any racial animus, and the plaintiffs did not present any evidence that racial animus was present in this process.[3] As the majority opinion states, the "summary judgment record reflects no evidence that racial considerations were discussed by the participants in the 1968 constitutional revision process when they passed the felon disenfranchisement provision."

Florida's revision of its constitution in 1968 distinguishes it from some other states with a history of racial discrimination. For instance, the State of Alabama enacted a felon disenfranchisement provision in 1901 with the specific intent of disenfranchising African American voters, and unlike Florida, Alabama never revisited the provision through the legislative process. Hunter, 471 U.S. at 233, 105 S.Ct. at 1922.

---

[3]The plaintiffs stipulate that there is no evidence that legislators were concerned with or considered the consequences of the policy along racial lines.

## C. Equal Protection Analysis

A facially-neutral provision violates the Equal Protection Clause if adopted with the intent to discriminate against a racial group. Washington v. Davis, 46 U.S. at 239, 2040 S.Ct. at 2047. Here, there is no allegation in the complaint that the 1968 Constitution was adopted with the intent to discriminate based on race.

### 1. Applying Hunter v. Underwood

In Hunter v. Underwood, the Supreme Court examined head-on the issue of felon disenfranchisement. 471 U.S. at 223, 105 S.Ct. at 1917. The Court determined that the Alabama Constitution violated the Equal Protection Clause because it was adopted in 1901 as a means of minimizing the political power of its African American population. Id. at 228-230, 105 S.Ct. at 1920-21. There, Alabama's elected representatives neither altered the provision nor reenacted it in a political atmosphere free of racial bias. Rather, all of the amendments to the constitution were the result of judicial action. Id. at 233, 105 S.Ct. at 1922.

In Hunter, the Supreme Court, affirming the decision of this court, established an easily applied test for finding Equal Protection Clause violations in the context of felon disenfranchisement. Id. at 227-28, 105 S.Ct. at 1920. (1985). That test is as follows:

41

Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of Arlington Heights to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment: "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact ... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Once racial discrimination is shown to have been a "substantial" or "motivating" factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.

Id. (citation omitted).

Under this analysis, we apply a two-step test to determine whether a particular felon disenfranchisement provision violates the Equal Protection Clause. First, we examine whether there is any proof that racial discrimination was a substantial or motivating factor in the state's decision to deny the right to vote to felons. Second, we determine whether the state can show that the provision would have been enacted without the racially discriminatory motive.

For the purposes of appeal, we assume, without deciding, that the plaintiffs have demonstrated that there was some racial animus in the 1868 Constitutional process. This, however, does not lead to the conclusion that race was a motivating factor in the political process which resulted in the 1968 Constitution, a hundred years later.

We next examine whether Florida would have chosen to disenfranchise felons if legislators did not have a discriminatory motive. In Hunter, this was a

42

more complicated analysis because it required a counter-factual scenario: Given that Alabama only legislatively addressed this issue once, what would legislators have done if they did not have a discriminatory motive?  471 U.S. at 228-29, 105 S.Ct. at 1920.  Here, we have the luxury of not having to delve into complex counter-factual scenarios because Florida simplified the analysis by returning to the issue in 1968. Florida's 1968 Constitution permits us to determine whether the state would have chosen to disenfranchise felons if the impermissible motive was absent.  The results are plain: There is no allegation of racial discrimination in 1968 and legislators decided to include a felon disenfranchisement provision in the revised constitution after consideration by two committees.  This decision was then affirmed by both houses of the legislature and by popular referendum.

Thus, Florida's provision is not a violation of the Equal Protection Clause under the standard adopted by the Supreme Court in Hunter.  Florida's reenactment of the felon disenfranchisement provision in the 1968 Constitution conclusively demonstrates that the state would enact this provision even without an impermissible motive.  Reenactment is *exactly* the measure that we would require Florida to take if we did find an Equal Protection Clause violation, and thus the state has already cured the provision on its own initiative.  The state, therefore, has

met its burden as a matter of law by undertaking the precise measure the plaintiffs are seeking.[4]

Moreover, Florida's provision is arguably not even subject to this type of intent analysis because the felon disenfranchisement provision did not create a disparate impact along racial lines in 1968. Accepting the plaintiffs' best estimates for 1968 as true, the felon disenfranchisement provision denied voting rights to far more whites than African Americans and decreased the percentage of African-American voters state-wide by less than one quarter of one percent.[5] Although proportionately more African American were affected, the percentage of eligible African Americans voters in the voting age public in 1968 dropped only from 12.53% to 12.32% due to felony convictions. The majority focuses on the *present* racially disparate impact of the felon disenfranchisement provision, but this disparate impact was not present in 1968.

## 2. The Majority's Standard

---

[4]The majority states that Florida must prove that it would have enacted this provision in 1868 without a discriminatory motive to withstand summary judgment. This would be the case if the 1868 provision was being challenged. In the current litigation, however, the plaintiffs are challenging the 1968 provision and they have presented no evidence that this provision, passed one hundred years later, was motived by discriminatory intent.

[5] Doc. 163-Addendum. The plaintiff's best estimates show that 44,562 white voters and 16,150 African American voters were disenfranchised in 1968 due to a felony conviction.

The majority establishes a different standard than the one announced in

Hunter.  Instead of examining whether legislators would have enacted the felon

disenfranchisement provision if they did not have an impermissible motive, the

majority remands the case to the district court and requires that the state prove that

it "knowingly and deliberatively reenacted it for a  non-discriminatory reason."

This standard is beyond what is required by Hunter because it invalidates facially-

neutral provisions enacted by legislators who are not alleged to have discriminatory

motives.[6]  In effect, the majority requires that the State of Florida show that it

considered the alleged racial discrimination in the 1868 Constitution and that it

"knowingly and deliberately" decided to re-enact the provision for other reasons in

1968.  The present law does not require this level of proof.  Florida's current

provision is constitutional because–as the majority agrees–there is no evidence of

any racial bias in the re-enactment. See also Cotton v. Fordice, 157 F.3d 388 (5th

Cir. 1998) (holding that a felon disenfranchisement provision did not violate the

---

[6]The majority cites Hunter for the proposition that "proof of discriminatory intent behind a specific policy in the past creates an inference that the impermissible purpose continues into the present despite the passage of time and *even, in some instances, intervening changes to the policy*." (emphasis added).  In Hunter, the Supreme Court found that revision to the state provision by *state courts*, which severed "some of the more blatantly discriminatory" portions of the law, did not purge the provision of its *legislative* intent. 471 U.S. at 232-33.  However, the Supreme Court did not hold that intervening *legislative* changes to the policy were legally insufficient to remove an earlier discriminatory intent.  Because the present case deals with legislative changes, rather than judicial changes, to the felon disenfranchisement policy, Hunter should not be read to support the proposition that an impermissible motive in Florida's 1868 Constitution continues to the present in spite of legislative changes made in the 1968 Constitution.

Equal Protection Clause because the current provision was adopted without discriminatory intent.).

A. Justifying Heightened Review

The majority argues that Florida's 1968 facially-neutral provision, passed without any evidence of racial discrimination, should be deemed a violation of the Equal Protection Clause. To support its position, the majority relies on United States v. Fordice, 505 U.S. 717, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992), which involved a challenge to Mississippi's system of higher education. Fordice, however, involved an extreme case of recent state discrimination. There, Mississippi actively resisted removing the segregated system of education in the 1960s, failed to fund even limited educational reform in 1969, and was sued by the United States and private plaintiffs in 1975 for failing to comply with the Equal Protection Clause. Id. at 722-25, 112 S.Ct. at 2732-34. The issue in Fordice was whether the state's facially-neutral education system, which was passed only after the state was required to integrate its school by court order, was valid under the Equal Protection Clause if the system maintained the racially disparate impact that de jure segregation had created. The Supreme Court found that Mississippi's actions were not consistent with the Equal Protection Clause if Mississippi made no

46

effort to remove the discriminatory effects of de jure segregation. The present case and Fordice are simply not analogous.

First, Florida's 1968 provision did not continue the adverse disparate impact of earlier de jure measures, which makes the present case entirely different than the situation in Fordice. At the time the Mississippi legislature adopted its education system, the system of higher education was almost completely racially segregated. Id. at 722, 112 S. Ct. at 2732. In Fordice, therefore, the Supreme Court was concerned that Mississippi was attempting to perpetuate its racially segregated education system, established in a time of de jure segregation, through a facially-neutral provision. In contrast, when Florida adopted its felon-disenfranchisement provision in 1968, the racial effects of the provision were minor. In 1968, Florida legislators and voters were not attempting to extend the effects of de jure discrimination with a facially-neutral provision because there was no adverse impact to extend by passing the felon disenfranchisement provision.[7] Florida's provision simply did not maintain a pattern of discrimination the way

_____

[7]The majority repeatedly refers to the current effects of the felon disenfranchisement provision–some forty years after it was passed–but this is simply not relevant for understanding the motives of legislators in 1968. Unlike in Fordice, the racially disparate effect of the Florida's voting provision was not present when the provision was passed. In contrast to school desegregation where the racially disparate impact was at its height in the 1950s and 1960s and has decreased since, the felon disenfranchisement rule had very little racially disparate impact in the 1960s and only developed such an effect many years later.

47

Mississippi's provision did.  Consequently, the heightened review used in Fordice is not appropriate here.

Second, the current Florida provision was passed one hundred years after allegedly intentional discrimination occurred, whereas Mississippi's provision was passed shortly after the end of de jure segregation in education.  Needless to say, the Florida legislators who passed the 1868 Constitution and the 1968 Constitution were not the same people.  In Fordice, however, the legislators, who refused to desegregate the Mississippi schools without a court order in the 1960s, most likely overlapped significantly with the legislators who passed the facially-neutral education system in the 1970s.  Given the proximity in time between Mississippi's intentional discrimination and the facially-neutral provision in education, we should have a healthy skepticism that the facially-neutral provision was indeed neutral.  Certainly, the Mississippi legislators who voted for the facially-neutral provision understood the history of racial segregation in education and the likely racial effects of their new education system.  But this healthy skepticism should not be applied here, because it is not reasonable to assign any impermissible motives held by the 1868 Florida legislators to the 1968 legislators who voted for the present felon disenfranchisement provision.

Third, Florida has a valid public policy reason for disenfranchising felons, where Mississippi did not have a sound justification for its education policies. The majority quotes Justice Thomas's concurrence in <u>Fordice</u>, but Justice Thomas specifically states that this heightened review is only applicable when there is no sound public policy justification for the state law, stating: "A challenged policy does not survive under the standard we announce today if it began during the prior de jure era, produces adverse impacts, and persists without sound educational justification." <u>Fordice</u>, 505 U.S. at 746, 112 S.Ct. at 2745 (emphasis added). Where Mississippi schools did not have valid educational justification for maintaining segregated schools, Florida has a legitimate reason for denying the vote to felons.

Finally, we note that this circuit has been reluctant to extend the education line of cases to other areas. As this court stated in <u>Burton v. City of Belle Glade</u>, school desegregation jurisprudence is unique and thus difficult to apply in other contexts. 178 F.3d 1175, 1190 (1999) (stating "In the first place, Appellants can point to no court that has ever applied Fordice outside of the education setting. Indeed, given the unique nature of school desegregation, we hesitate to extend Fordice to a property annexation case.") Moreover, as argued earlier, there is specific precedent from this court and the Supreme Court dealing with felon

49

disenfranchisement. See <u>Richardson v. Ramirez</u>, 418 U.S. 24, 94 S.Ct. 2655 (1974), <u>Hunter v. Underwood</u>, 471 U.S. 222, 105 S.Ct. 1916 (1985), <u>Beachum v. Braterman</u>, 300 F. Supp. 182, 183 (1969), <u>aff'd</u> 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969) (finding by a three judge panel that Florida's decision to disenfranchise felons was not a violation of the plaintiff's equal protection or due process rights). Because these cases establish clear standards by which to judge state action, we are bound by precedent and need not go into other areas of possibly analogous law.

### B. Sufficient Deliberation

The majority argues that Florida has not yet demonstrated that it has "broken the causal chain" between the 1868 Constitution and the current provision. It maintains that the 1968 constitutional revisions to this provision were not sufficient because legislators did not adequately deliberate over this issue. But the record belies this conclusion: The provision was subject to significant deliberation.

The 1968 Constitution's felon disenfranchisement rule was first actively considered by the Suffrage and Elections Committee. The record reflects that the committee discussed the provision, debated proposed changes, and ultimately decided to adopt the present provision, which is different from the 1868 provision.

50

The committee also considered an alternative motion that would have eliminated the disenfranchisement rule to felons released from incarceration.[8]  After discussion, the alternative motion failed.  The new constitution was then accepted by the full committee, approved by both legislative houses, and affirmed by a state-wide referendum–all without any allegation of racial bias.   Although reasonable people may disagree over the wisdom of the policy choice, the provision certainly received sufficient deliberation.

### 3. Wisdom of the Policy

Several of the amici argue that, as a policy matter, felons should be enfranchised, particularly those who have served their sentences and presumably paid their debt to society.  But this is a policy decision that the United States Constitution expressly gives to the state governments, not the federal courts.  U.S. CONST. amend. XIV, § 2.   Florida already has legislatively reexamined this provision since 1868 and affirmed its decision to deny felons the vote.  Federal courts cannot question the wisdom of this choice.

---

[8]The minutes of the committee meeting record the following motion was considered: "Mr. Goodrich offered the following substitute motion to Mr. Pettigrew's motion: Delete Section 4 and insert: "The Legislature may by law exclude persons from voting because of mental incompetence or commitment to a jail or penal institution." After discussion, Mr. Goodrich's motion failed for lack of a second."
Doc. App. 10 at 983.

51

For the above reasons I would affirm the district court's grant of summary judgment on this count.

## II. The Voting Rights Act Claim

I also respectfully dissent from the majority's remand of the Voting Rights Act claim. In my view, the Voting Rights Act does not apply to felon disenfranchisement provisions. The majority's interpretation of the scope of the Voting Rights Act creates grave questions as to the constitutionality of the Voting Rights Act and is contrary to Congress's statements regarding its coverage.

### A. The Scope of the Voting Rights Act

Florida's discretion to deny the vote to convicted felons is fixed by the text of § 2 of Fourteenth Amendment, which states:

> [W]hen the right to vote…is denied to any of the male inhabitants…or in any way abridged, *except for participation in rebellion, or other crime*, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend. XIV, § 2 (emphasis added).[9]  Interpreting the Voting Rights

Act to deny a state this discretion, as the majority does, creates a constitutional

problem because such an interpretation allows a congressional statute to trump the

text of the Constitution.

It is a long-standing rule of statutory interpretation that federal courts should

not construe a statute to create a constitutional question unless there is a clear

statement from Congress endorsing this understanding.  As the Supreme Court

stated in DeBartolo Corp. v. Florida Gulf Coast Trades Council:

> [W]here an otherwise acceptable construction of a statute would raise
> serious constitutional problems, the Court will construe the statute to
> avoid such problems unless such construction is plainly contrary to the
> intent of Congress.  This cardinal principle has its roots in Chief
> Justice Marshall's opinion for the Court in Murray v. The Charming
> Betsy, 2 Cranch 64, 118, 2 L.Ed. 208 (1804), and has for so long been
> applied by this Court that it is beyond debate....This approach not only
> reflects the prudential concern that constitutional issues not be
> needlessly confronted, but also recognizes that Congress, like this
> Court, is bound by and swears an oath to uphold the Constitution.  The

---

[9]The full text of Section 2 states:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.  But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.

485 U.S. 568, 575, 108 S.Ct. 1392, 1397-98, 99 L.Ed.2d 645 (1988). Thus when we analyze the scope of the Voting Rights Act, we should first address whether one interpretation presents grave constitutional questions where other interpretations would not, and then examine whether the latter interpretation is clearly contrary to Congressional intent. Id.

Here, the majority's interpretation creates a serious constitutional question by interpreting the Voting Rights Act to trump the text of the Fourteenth Amendment.[10] Congress undoubtedly has the constitutional authority to prohibit many measures that are not explicitly prohibited in the Fourteenth Amendment, but this enforcement power arguably does not extend to prohibiting constitutionally protected practices. This is not to say that a state's felon disenfranchisement provisions can never be challenged. As pointed out above and as the decision in Hunter confirmed, states cannot use felon disenfranchisement provisions to discriminate intentionally on the basis of race. 471 U.S. at 233, 105 S.Ct. at 1923. Thus, the plaintiffs have a remedy if the state's provision violates the Equal

---

[10] If this court chooses to adopt an interpretation that confronts the constitutional question, then we must address directly whether Congress has the power to trump constitutional provisions that are not applied in violation of the Equal Protection Clause.

54

Protection Clause.  Id.  It is a different matter, however, when a statute limits a state's delegated power in contravention of the Fourteenth Amendment's text.

The majority opinion cites Hunter for the proposition that the felon disenfranchisement provisions can be challenged under the Voting Rights Act.  But in Hunter, the Supreme Court dealt exclusively with the Equal Protection Clause and did not discuss the Voting Rights Act.  The Supreme Court has never given any indication that the felon disenfranchisement provisions can be challenged under the Voting Rights Act.  To the contrary, in Richardson v. Ramarez, the Supreme Court explained that felon disenfranchisement provisions are different from other state franchise rules because they are permitted by the Fourteenth Amendment's express language. 418 U.S. 24, 54, 94 S.Ct. 2655, 2671(1974).

For the majority's analysis of the Voting Rights Act to be correct, we must look for a clear statement from Congress that it intended such a constitutionally-questionable result.  DeBartolo, 485 U.S. at 575, 108 S.Ct. at 1397.  Instead of a clear statement from Congress that the majority's interpretation was intended, the legislative history indicates just the opposite—that Congress did not intend the Voting Rights Act to apply to felon disenfranchisement provisions.[11]

---

[11]  The Second Circuit reinstated a district court opinion that reached the same conclusion on the scope of the Voting Rights Act.  In Baker v. Pataki, an en banc panel was evenly split on the issue.  85 F.3d 919 (2d Cir. 1996). In an opinion urging the court to affirm, Judge Mahoney, joined by four other judges, argued that the Voting Rights Act was of questionable constitutionality if it

1.  Congressional Statements in 1965

The scope of the Voting Rights Act is limited.  Congress first passed the act

in 1965 to prevent states from discriminating against minorities in voting.[12]  The act

was intended to cover voting tests and other practices, such as districts designed by

states to minimize minority voting.  See Burton v. City of Belle Glade, 178 F.3d

1175, 1196 (11th Cir. 1999).  The Senate and House reports make clear, however,

that Congress did not intend the Voting Rights to cover felon disenfranchisement

provisions.  The reports indicate that tests for literacy or good moral character

should be scrutinized, but felon disenfranchisement provisions should not.  S. Rep.

89-162, 1965 U.S.C.C.A.N. 2508, 2562. The only place where legislators addressed

---

applied to felon disenfranchisement provisions. Id. at 929-32.   The judges looked for a clear statement from Congress supporting this interpretation and found evidence of Congressional support to be "manifestly lacking."  Id. at 930.

Only the Ninth Circuit has found a felon disenfranchisement provision to be a statutory violation.  Farrakhan v. Washington, 338 F.3d 1009 (9th Cir. 2003).  There, the plaintiffs brought a Voting Rights Act challenge to the State of Washington's felon disenfranchisement provision, claiming that racism in the criminal justice system interacted with the state's suffrage laws to deny equal voting opportunities to minorities. Id. at 1020. The Ninth Circuit reversed the grant of summary judgment, but did not specifically address the constitutionality of its interpretation. Logically, that court must have found that the statute covered the challenged provision and that Congress had the constitutional authority to regulate felon disenfranchisement provisions to reach its holding.  Nevertheless, the Ninth Circuit did not provide any reasoning for its finding, and thus that court's decision, which is only persuasive authority in our circuit, should not inform our analysis.

[12]Section 1973 of the Voting Rights Act in 1965 stated:
No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

felon disenfranchisement provision was with regard to Section 4, where the Senate

Report reflects that legislators intended to exempt the voting restrictions on felons

from the statute's coverage, stating:

> The third type of test or device covered is any requirement of good
> moral character.  This definition would not result in the proscription of
> the frequent requirement of States and political subdivisions that an
> applicant for voting or registration for voting be free of conviction of a
> felony or mental disability.

Id.

Likewise the House Report also states that the Voting Rights Act was not designed

to prohibit felon disenfranchisement:

> This subsection does not proscribe a requirement of a State or any
> political subdivision of a State that an applicant for voting or
> registration for voting be free of conviction of a felony or mental
> disability.

1965 U.S.C.C.A.N. 2437, 2457.  These reports indicate that neither house of

Congress intended to include felon disenfranchisement provisions within the

statute's scope.  These are the only references to felon disenfranchisement made in

reports to the 1965 act.

Furthermore, this court's predecessor previously decided that the 1965 act

did not cover a state's decision to exclude felons from voting.  In United States v.

Ward,  the former Fifth Circuit held that the Voting Rights Act prohibited Louisiana

57

from imposing any literacy test or other qualification on voter registration, but found that the act did not extend to felon disenfranchisement rules. 352 F.2d 329, 332 (5th Cir. 1965).[13] There, the court issued an order enjoining the state from applying the voting tests, but explicitly exempted felony convictions from the order. The court ordered that the state cease

> ...requiring any applicant for voter registration in Madison Parish, as a precondition to such registration, to take or pass any test of literacy, knowledge, or understanding or to comply with any other test or device as defined in Section 4(c) of the Voting Rights Act of 1965, Public Law 89-110, 79 Stat. 438-439, i.e., any requirement (including the 'good character' requirement specified in Article VIII, Section 1(c) of the Louisiana Constitution and Title 18, Section 32, of the Louisiana Code, *except to the extent that these provisions permit disqualification for conviction of a felony)*.

Id. at 332 (emphasis added).


2.  Congressional Statements in 1982

Congress most recently amended the Voting Rights Act in 1982 in response to the Supreme Court's decision in Bolden v. City of Mobile, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), in an attempt to clarify the standard for finding statutory violations. In revising the statute, Congress intended to depart from the intent-based standard of the Supreme Court's Equal Protection jurisprudence and

---

[13]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

establish an effects-based standard.  S. Rep. 97-417, 15-17, 1982 U.S.C.C.A.N. 177, 192-94 (1982).  After the 1982 amendment, a state practice could survive Equal Protection Clause scrutiny but fail Voting Rights Act scrutiny.

Although the 1982 amendments were significant in terms of the legal test applied to practices covered by the act, they are not relevant here because the challenged provision remains outside the scope of the Voting Rights Act.  Neither the plain text nor the legislative history plainly declares Congress's intent to extend the Voting Rights Act to felon disenfranchisement provisions.[14]  The Senate Report, which goes into great detail on legislative intent, made no mention of felon

---

[14] The current text, as amended in 1982, states:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:  Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Section 1973b(f)(2) states that:
No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.

disenfranchisement provisions.[15]  Although it is conceivable that certain legislators

may have wanted the Voting Rights Act to encompass felon disenfranchisement

provisions, we should not assume that Congress intended to produce a statute

contrary to the plain text of the Fourteenth Amendment without a clear statement.

DeBartolo, 485 U.S. at 575, 108 S.Ct. at 1397.

In short, I believe the majority adopts a constitutionally questionable

interpretation of the Voting Rights Act–one in which the statute prohibits a practice

that the Fourteenth Amendment explicitly permits.  As a matter of statutory

construction, we should avoid such an interpretation.  Moreover the case for

rejecting the majority's interpretation is particularly strong here, where Congress

has expressed its intent to exclude felon disenfranchisement measures from Voting

Rights Act scrutiny.[16]

---

[15]  In addition, there are currently two bills circulating in Congress that aim to limit a state's discretion to disenfranchise felons and include findings that felon disenfranchisement provisions create a disparate racial impact. Civil Participation and Rehabilitation Act, H.R. 259, 108th Cong. § 2(g) (2003), Ex-Offenders Voting Rights Act of 2003, H.R. 1433, 108th Cong. § 2(a)(11) (2003).  Although not dispositive in interpreting the scope of the Voting Rights Act, it is unclear why these bills have been proposed if Congress has the clear understanding that the Voting Rights Act currently covers these cases.

[16] Even if we assume that the Voting Rights Act applies to Florida's provision, the plaintiffs still must demonstrate that specific racial biases in society cause minorities to be convicted of felonies at a higher rate than whites.  Cf. Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1987) (stating that the Voting Rights Act requires that electoral practices interact with social or historical conditions *to cause* an racial inequality in the political process). Without such an initial showing, the plaintiffs do not allege a sufficiently specific nexus between racial discrimination and the felon disenfranchisement rule.

The majority opinion discusses a long list of possible areas of discrimination, but here we

60

Accordingly, I dissent from the decision to remand and would affirm the district court on this count also.

---

are concerned only with how the state discriminates against similarly situated persons who have committed felonies. The record includes some evidence that there is a statistical difference in the rate of felony convictions along racial lines, even accounting for other factors. This finding is disturbing, but the statistical analysis cannot speak to causation. The plaintiffs' statistical findings only demonstrate correlations between different variables and do not purport to establish causal relationships between these variables. Causation analysis must come from sources external to the statistical analysis. Thus by definition, the plaintiffs cannot establish a *causal* nexus between variables by statistical results alone.

The majority emphasizes that Voting Rights Act requires a "totality of the circumstances" analysis to evaluate whether racial discrimination, outside of the voting context, causes racial discrimination in the political process. I agree that this is the correct standard. I respectfully disagree with the majority, however, over what evidence is necessary to demonstrate that the alleged disparate impact in voting is caused by discrimination outside of the political process.